STATE of Minnesota, Respondent,

v.

Christopher Dineaa BAHTUOH,
Appellant.

Nos. A10–1584, A12–1281.

Supreme Court of Minnesota.

Dec. 26, 2013.

806

Lori Swanson, Attorney General, Saint Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Elizabeth Johnston, Assistant County Attorney, Minneapolis, MN, for respondent.

Frederick J. Goetz, Gregory J. Young, Goetz & Eckland P.A., Minneapolis, MN, for appellant.

## OPINION

STRAS, Justice.

In a consolidated appeal, appellant Christopher Dineaa Bahtuoh challenges his conviction of first-degree felony murder while committing a drive-by shooting for the benefit of a gang. In his direct appeal, Bahtuoh argues that the record contains insufficient evidence to support his conviction. In his postconviction ap-

peal, Bahtuoh argues that the district court misstated the law when it instructed the jury on accomplice liability, that trial counsel coerced him into not testifying at trial, that he received ineffective assistance of trial counsel, and that the district court abused its discretion when it denied his motion for a mistrial. Bahtuoh also argues in a pro se supplemental brief that the jury's verdicts are legally inconsistent and that the postconviction court erred when it denied an evidentiary hearing on his claim that the district court violated his right to a public trial. We affirm.

## I.

On the evening of April 28, 2009, Kyle Parker was at his mother's home in Minneapolis with two other men from his neighborhood, A.M. and N.A. While the three men were outside, Bahtuoh drove past the home, turned his car around, and then drove toward them. Bahtuoh, who knew Parker, opened a car window and called for Parker. As Parker approached the car, Bahtuoh's passenger—later identified as Lamont McGee—shot Parker multiple times. Bahtuoh then drove away, speeding through a stop sign. After Parker's sister learned of the shooting, she ran to Parker. Parker told her that Bahtuoh was responsible for the shooting. Parker died later that evening from the gunshot wounds.

Bahtuoh and his attorney met with the police approximately 6 weeks later. Bahtuoh waived his right to remain silent and denied any involvement in the shooting. The next day, the State charged Bahtuoh by complaint with intentional second-degree murder. *See* Minn.Stat. § 609.19, subd. 1(1) (2012). Bahtuoh admitted during a second conversation with the police that he was present at the scene of the shooting, drove the car, and fled the scene. Bahtuoh testified before a grand jury, which indicted him on four counts of first-degree murder, including first-degree felony murder while committing a drive-by shooting for the benefit of a gang, Minn. Stat. §§ 609.185(a)(3) (2012), 609.229, subd.(2012), and two counts of second-degree murder. On all six counts, the indictment charged Bahtuoh as both a principal and an accomplice.

At the jury trial that followed, defense counsel repeatedly told the jury during his opening statement that Bahtuoh would testify. Nevertheless, Bahtuoh later waived his right to testify and presented no witnesses in his defense. The jury found Bahtuoh not guilty of two of the counts of first-degree murder, but guilty of the four remaining counts of the indictment. The district court convicted Bahtuoh of each of the four counts on which the jury found him guilty, but sentenced him only on the count of first-degree felony murder while committing a drive-by shooting for the benefit of a gang. The district court sentenced Bahtuoh to life imprisonment with the possibility of release after 31 years. *See* Minn.Stat. §§ 609.185(a)(3), 609.229, subd. 2; *see also* Minn.Stat. § 244.05, subd. 4(b) (2012).

We stayed Bahtuoh's direct appeal to permit him to file a petition for postconviction relief. *State v. Bahtuoh*, No. A10–1584, Order at 1 (Minn. filed Nov. 16, 2010). In his postconviction petition, Bahtuoh alleged that the district court misstated the law when it instructed the jury on accomplice liability, that he did not voluntarily waive his right to testify, that he received ineffective assistance of trial counsel, that the district court should have granted a mistrial because the prosecutor committed misconduct, and that the district court violated his right to a public trial. The postconviction court granted an evidentiary hearing to Bahtuoh on his allegation that he did not voluntarily waive his

right to testify, but summarily denied relief to Bahtuoh on the remaining claims.

At the postconviction evidentiary hearing, Bahtuoh was the only witness who testified. Bahtuoh said that he was "shocked" and "confused" when, at a meeting the night before the State rested its case, defense counsel told Bahtuoh that he had decided not to have Bahtuoh testify. Bahtuoh also stated that defense counsel never advised him about the advantages and disadvantages of testifying. According to Bahtuoh, defense counsel simply instructed him to "say nothing other than [that he] understood the questions that [he] was being asked" when he was questioned about his decision not to testify on the record. The postconviction court found Bahtuoh's testimony unpersuasive and denied his petition for postconviction relief. Bahtuoh appealed the denial of his petition for postconviction relief, and we have consolidated Bahtuoh's direct and postconviction appeals into a single proceeding to facilitate review. *State v. Bahtuoh*, Nos. A10–1584, A12–1281, Order at 1 (Minn. filed Aug., 2012).

## II.

The first question presented by this case is whether the State presented sufficient evidence to support Bahtuoh's conviction of first-degree felony murder while committing a drive-by shooting for the benefit of a gang. *See* Minn.Stat. §§ 609.185(a)(3), 609.229, subd. 2. Although the indictment charged Bahtuoh both as a principal and as an accomplice, the evidence at trial showed that Bahtuoh did not shoot Parker. Therefore, the parties agree that we should address the sufficiency of the evidence only with respect to Bahtuoh's liability as an accomplice. Bahtuoh's challenge focuses on whether the evidence was sufficient to prove beyond a reasonable doubt that he intentionally aided McGee, the man who shot Parker.

■■ When considering a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and assume that the jury disbelieved any evidence that conflicts with the verdict. *State v. Thomas*, 590 N.W.2d 755, 757 (Minn.1999). We will uphold the verdict if the jury, "giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, could reasonably have found the defendant guilty of the offense charged." *Id.* at 757–58.

■ The State ordinarily proves a criminal defendant's mental state by circumstantial evidence. *State v. Schneider*, 402 N.W.2d 779, 782 (Minn.1987). This case is no exception: the State relied solely on circumstantial evidence to prove that Bahtuoh intentionally aided McGee in the commission of first-degree felony murder while committing a drive-by shooting for the benefit of a gang. When a challenge is to the sufficiency of the circumstantial evidence supporting a conviction, we apply the following two-step analysis:

> First, we must identify the circumstances proved, giving deference to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State. Second, we independently examine the reasonableness of all inferences that might be drawn from the circumstances proved, including inferences consistent with a hypothesis other than guilt. Thus, our review consists of determining whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt.

*State v. Anderson*, 789 N.W.2d 227, 241–42 (Minn.2010) (citations omitted) (internal

quotation marks omitted). In applying the circumstantial-evidence standard, we must determine whether the circumstances proved by the State support a rational hypothesis that Bahtuoh acted as McGee's accomplice and are inconsistent with any rational hypothesis that Bahtuoh did not act as McGee's accomplice.

█ A defendant is guilty as an accomplice of an offense committed by another person if the defendant "intentionally aids, advises, hires, counsels, or conspires with or otherwise procures [another person] to commit" the offense. Minn.Stat. § 609.05, subd. 1 (2012) (the "accomplice-liability statute"). The phrase "intentionally aids" in the accomplice-liability statute includes two "important and necessary principles: (1) that the defendant 'knew that his alleged accomplices were going to commit a crime,' and (2) that the defendant 'intended his presence or actions to further the commission of that crime.'" *State v. Milton*, 821 N.W.2d 789, 805 (Minn.2012) (quoting *State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn.2007)). A jury may infer the requisite state of mind from a variety of facts, including presence at the scene of the crime, a close association with the principal offender before and after the crime, a lack of objection or surprise under the circumstances, and flight from the scene of the crime with the principal offender. *State v. Hawes*, 801 N.W.2d 659, 668 (Minn.2011).

█ Under the first step of the circumstantial-evidence standard, we identify the circumstances proved by the State, which are as follows. Bahtuoh and Parker were members of rival gangs that have a history of violent conflict. In the 2 hours immediately preceding the shooting, at least 13 calls were made from Bahtuoh's cell phone to telephone numbers that were associated with other known members of his gang.

In the hours preceding the shooting, Bahtuoh drove his car from a known gang hangout to the location of the shooting at least three times.

At the scene of the shooting, Bahtuoh drove and positioned the car so that McGee was close to Parker. Bahtuoh then summoned Parker to the car. As Parker approached the car, Parker's friend, A.M., asked him whether everything was "cool." Parker said "yes" and told A.M. that Bahtuoh was a "nobody." Bahtuoh saw McGee pull out a gun and point it at Parker. Bahtuoh then saw McGee fire multiple close-range shots at Parker. In the seconds before, during, and after the shooting, Bahtuoh kept the car stationary and did not object, express surprise, or otherwise attempt to stop McGee from shooting Parker. Bahtuoh then fled the scene at high speed rather than attempting to assist Parker or call the authorities.

Shortly after the shooting, Bahtuoh met with a member of his gang whom he had called immediately before the shooting. In the hours that followed, at least three additional calls were made from Bahtuoh's cell phone to telephone numbers that were associated with known members of his gang. Bahtuoh also moved his car to a remote location, removed identifying information from the car, placed his cell phone in the trunk of the car, and lied to his girlfriend's family when he asked them for a place to stay. In addition, Bahtuoh lied to the police when he initially told them that he was not involved in Parker's shooting.

The second step of the circumstantial-evidence standard requires us to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than guilt. As applicable here, the circumstantial-evidence standard requires us to evaluate whether the circumstances proved lead

to only one reasonable conclusion: that Bahtuoh *knew* that McGee was going to commit a crime and *intended* to further the commission of that crime.

The circumstances proved lead to a number of reasonable inferences related to Bahtuoh's mental state. Bahtuoh made three trips between a known gang hangout and the home where the shooting occurred in order to find Parker, a known member of a rival gang. When Bahtuoh eventually spotted Parker, Bahtuoh turned the car to place McGee close to Parker. Bahtuoh summoned Parker to the car, and Parker—who apparently did not feel threatened by Bahtuoh—obliged. Bahtuoh did not interfere, object, or otherwise attempt to stop McGee from shooting Parker because McGee's actions did not surprise or upset Bahtuoh. Bahtuoh fled rather than attempting to assist Parker or call the authorities because he did not intend to assist Parker. Bahtuoh disposed of the evidence and lied to his girlfriend's family and the police because he was aware of his guilt and sought to avoid arrest. These reasonable inferences support the hypothesis that Bahtuoh knew that McGee was going to commit a crime and intended his presence and actions to further the commission of that crime. We therefore conclude that the circumstances proved are consistent with Bahtuoh's guilt.

Bahtuoh argues that the circumstances proved also support a rational hypothesis consistent with his innocence: that Bahtuoh merely had a relationship with gang-affiliated individuals and did not know that McGee intended to shoot Parker. Bahtuoh's alternative hypothesis, however, is unreasonable in light of the circumstances proved. Only a person who knew of a planned shooting and intended to further the shooting would (1) fail to object, express surprise, or attempt to stop another person from shooting an unarmed individual; (2) flee the scene without rendering aid to a severely wounded individual whom he knew; and (3) evidence from the shooting and lie to his girlfriend's family and the police. Because there is no rational hypothesis in this case other than Bahtuoh's guilt, we conclude that the State presented sufficient evidence that Bahtuoh intentionally aided McGee in committing first-degree felony murder during the course of a drive-by shooting for the benefit of a gang.

## III.

The second question presented by this case is whether the district court misstated the law on accomplice liability in its instructions to the jury. Bahtuoh argues that the jury instructions were erroneous because they relieved the State of its burden of proving beyond a reasonable doubt that Bahtuoh knew McGee planned to commit a crime and that Bahtuoh intended his presence to further the commission of that crime.

Bahtuoh did not object to the challenged instructions at trial, so we review them for plain error. Minn. R.Crim. P. 31.02 ("Plain error affecting a substantial right can be considered by the court ... on appeal even if it was not brought to the trial court's attention."). In reviewing for plain error, we examine whether (1) there was error, (2) the error was plain, and (3) the error affected the defendant's substantial rights. *State v. Schlienz,* 774 N.W.2d 361, 366 (Minn.2009). Even if the answer to all three inquiries is "yes," we will order a new trial only if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *State v. Scruggs,* 822 N.W.2d 631, 642 (Minn.2012).

As we explained in *State v. Mahkuk,* to establish that a defendant had the requisite state of mind to be guilty as an accomplice, the State must prove that

the defendant "knew that his alleged accomplices were going to commit a crime and . . . intended his presence or actions to further the commission of that crime." 736 N.W.2d 675, 682 (Minn.2007). Recently, we reaffirmed the mental-state requirements for accomplice liability in *State v. Milton:*

> [A]n accomplice liability instruction must explain to the jury that in order to find a defendant guilty as an accomplice, the jury must find beyond a reasonable doubt that the defendant knew his alleged accomplice was going to commit a crime and the defendant intended his presence or actions to further the commission of that crime.

821 N.W.2d 789, 808 (Minn.2012) (citing *Mahkuk,* 736 N.W.2d at 682).

In this case, the district court did not expressly instruct the jury on the two components of the mental state required for accomplice liability. Instead, the district court instructed the jury, in relevant part, as follows:

> Under Minnesota law, a defendant can be held liable for a crime even though another person actually committed the criminal acts, provided the defendant intentionally aided, advised, hired, counseled, conspired with or otherwise procured the other person to commit the crime. This is called aiding and abetting. This concept applies to all of the six counts that are being submitted to you for decision.
>
> In order to aid and abet another in the commission of a crime, the defendant must voluntarily associate himself with the criminal venture, do something to actually help the criminal venture succeed.
>
> Mere presence at the scene of a crime without more is not enough for you to impose liability under the aiding and abetting law. Such a person is merely a witness. However, a person's presence can constitute aiding and abetting if it is done intentionally and if it also aids or encourages the commission of the crime to any degree.

Bahtuoh argues that the instruction misstated the law when it said that "a person's presence can constitute aiding and abetting if it is done intentionally and if it also aids or encourages the commission of the crime to any degree." In *Mahkuk,* we said that a similar instruction "compounded . . . error" found elsewhere in the instructions. 736 N.W.2d at 681, 683. Specifically, we stated that the language was erroneous because it "relieved the state of its burden to prove that [the defendant] intended his presence to further the commission of the crime." *Id.* at 683. Such language improperly allowed the jury to find that the defendant's intentional presence alone was sufficient to satisfy the state-of-mind requirements for accomplice liability, even if the defendant lacked any "intent that his presence aid or encourage the commission of the crime." *Id.*

In *State v. Brown,* 815 N.W.2d 609, 620–21 (Minn.2012), however, we concluded that an accomplice-liability instruction that featured language about "presence" that was similar to the instruction challenged by Bahtuoh, and materially identical to the language criticized in *Mahkuk,* was not erroneous. The State asks us to affirm under *Brown* rather than to reverse under *Mahkuk.*

We acknowledge the apparent tension between *Mahkuk* and *Brown* with respect to the instruction (given in both cases) that a "person's presence does constitute aiding and abetting if it is done intentionally and if it also aids or encourages the commission of the crime to any degree." *See Mahkuk,* 736 N.W.2d at 681; *Brown,* 815 N.W.2d at 621. The tension is more ap-

parent than real, however, because *Brown* never held that this *particular* language, considered in isolation, was a correct statement of the law-an assertion that would have directly contradicted *Mahkuk.* Instead, *Brown* held that "reading the instructions *as a whole* … the trial court did not err in its jury instruction." *Brown,* 815 N.W.2d at 621(emphasis added).

█ *Brown* focused on the jury instructions as a whole, rather than on any single instruction, because we review jury instructions "in their entirety to determine whether they fairly and adequately explain the law of the case." *State v. Ihle,* 640 N.W.2d 910, 916 (Minn.2002). Further, a careful review of both *Mahkuk* and *Brown* shows why we concluded in *Brown* that the jury instructions, considered as a whole, "did not relieve the State of its burden of proof on the elements of aiding and abetting murder." 815 N.W.2d at 621.

First, the jury instructions in *Brown* did not include the additional language from *Mahkuk* that relieved the State of its burden to prove the state of mind of the defendant. Specifically, a permissive instruction in *Mahkuk* informed the jury that, in making the determination about whether the defendant was guilty as an accomplice, it only had to *consider* "[w]hether the defendant knew that a crime was going to be committed by the other participants" and "[w]hether the defendant intended his presence or acts to encourage or further the completion of the crime by the other participants." 736 N.W.2d at 681. Such language was erroneous because "it eliminated the State's burden to prove intent." *Brown,* 815 N.W.2d at 621.

Second, unlike the instructions in *Mahkuk,* the instructions in *Brown* required the jury to find that the defendant "played some *knowing role* in the commission of

the crime or crimes" to find him guilty under an accomplice-liability theory. *Brown,* 815 N.W.2d at 621 (emphasis added). The "knowing role" language in *Brown* was consistent with language that we had used in an earlier case to describe the requisite mental state for accomplice liability. *State v. Gates,* 615 N.W.2d 331, 337 (Minn.2000), *overruled on other grounds by Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Indeed, when we explained the state-of-mind requirements for accomplice liability in *Mahkuk,* we relied on the "knowing role" language from the earlier case. *Mahkuk,* 736 N.W.2d at 682 (citing *Gates,* 615 N.W.2d at 337); *see also State v. Flowers,* 788 N.W.2d 120, 133–34 (Minn. 2010) (relying on the "knowing role" language in reviewing a challenge to the sufficiency of the evidence in an accomplice-liability case). There is no question that the "knowing role" language from *Brown,* standing alone, does not satisfy *Milton's* requirements for how to instruct a jury on the requisite mental states for accomplice liability. But the inclusion of the "knowing role" language, and the absence of any permissive language regarding the state-of-mind requirements for accomplice liability, led to our conclusion in *Brown* that the instructions, considered as a whole, were not erroneous.

That brings us to the jury instructions in this case. The State concedes, as it must, that the instructions in this case did not contain the "knowing role" language from *Brown.* Here, however, other instructions, which imposed a more stringent state-of-mind requirement than Minnesota law requires, counterbalanced the error in the "presence" instruction challenged by Bahtuoh. We therefore conclude that the instructions, considered as a whole, did not result in reversible error in this case. *See State v. Cox,* 820 N.W.2d 540, 550 (Minn.

2012) (reviewing the jury instructions as a whole to determine if reversible error occurred); *Ihle*, 640 N.W.2d at 916.

Rather than instructing the jury separately on accomplice liability and the elements of each substantive offense, the district court partially incorporated the theory of accomplice liability into its instructions on the six substantive offenses with which Bahtuoh was charged. For instance, with respect to first-degree murder by drive-by shooting for the benefit of a gang—the count on which the district court sentenced Bahtuoh—the court instructed the jury that the elements of the crime were:

First, the death of Kyle Parker must be proven.

Second, the defendant, acting alone or intentionally aiding and abetting another, caused the death of Kyle Parker.

*Third, the defendant, acting alone or intentionally aiding and abetting another, acted with the intent to kill Kyle Parker. To find the defendant had an intent to kill, you must find that the defendant acted with the purpose of causing death or believed that the act would have that result....*

Fourth, at the time of the act causing the death of Kyle Parker, the defendant, acting alone or intentionally aiding and abetting another, was engaged in the act of committing or attempting to commit the crime of drive-by shooting....

Fifth, the defendant committed this act for the benefit of, at the direction of, or in association with, or motivated by involvement with a criminal gang.

Sixth, the defendant acted with the intent to promote, further or assist in criminal conduct by gang members.

Seventh, the defendant's act took place on or about April 28th, 2009 in Hennepin County, Minnesota.

(Emphasis added).

Because of the hybrid nature of the instructions, the jury was required to find that Bahtuoh had a *more* culpable state of mind than is required for accomplice liability under Minnesota law. More specifically, the instruction on the third element required the jury to find that "the defendant, acting alone or intentionally aiding and abetting another, acted with the intent to kill Kyle Parker." Rather than requiring knowledge that McGee was going to commit a crime, as Minnesota law currently requires, the instruction required the jury to find that Bahtuoh *himself* "acted with the intent to kill Kyle Parker," regardless of whether it found that Bahtuoh acted as an accomplice or as a principal. The instruction also required the jury to determine, if it found that Bahtuoh did not shoot Parker, that Bahtuoh "intentionally aid[ed] and abett[ed] another"—the other mental-state requirement for accomplice liability under *Mahkuk* and *Milton*.

The instruction on the sixth element provides further support for our conclusion that the jury instructions, considered as a whole, required the jury to find that Bahtuoh *at least* possessed the mental states currently required for accomplice liability under Minnesota law. To find Bahtuoh guilty under *any* theory, the jury was required to find that Bahtuoh personally "acted with the intent to promote, further or assist in criminal conduct by gang members." That instruction reinforced the requirement that the jury had to find that Bahtuoh intended his actions to further the commission of the crime. Accordingly, the jury instructions, considered as a whole, ensured that the jury was required to find, at a minimum, that Bahtuoh knew that McGee planned to commit a crime and

intended his actions to further it. The instructions, therefore, satisfied the requirements of *Mahkuk* and *Milton*.

■ This case is thus more like *Brown* than *Mahkuk*. As in *Brown*, some of the individual jury instructions in this case were erroneous. However, the jury instructions, considered as a whole, did not constitute reversible error because, as we concluded in *Brown*, they did not relieve the State of its burden to prove that Bahtuoh had the requisite state of mind for accomplice liability.[1]

## IV.

■ The third question presented by this case is whether Bahtuoh knowingly and voluntarily waived his right to testify at trial. The right to testify is personal to the defendant, which means that only the defendant may waive the right and any waiver must be knowing and voluntary. *State v. Berkovitz*, 705 N.W.2d 399, 404–05 (Minn.2005). On appeal, the defendant has the burden to prove that his or her waiver was invalid. *Id.* at 405.

■ The postconviction court denied relief to Bahtuoh on his claim that his waiver was invalid. In doing so, the court declined to credit Bahtuoh's postconviction testimony, which is the only evidence in the record that supports Bahtuoh's allegation that he made the decision not to testify because of coercion by his trial counsel.

The court rejected Bahtuoh's postconviction testimony for two reasons, both of which relate to inconsistencies in Bahtuoh's statements regarding the circumstances surrounding his waiver.

First, the court found that Bahtuoh's testimony at the postconviction evidentiary hearing was internally inconsistent. Bahtuoh alternatively testified at the hearing that (1) and his attorney never discussed the advantages and disadvantages of not testifying, (2) and his attorney "went back and forth" about whether to testify, and (3) did not remember whether his attorney explained the advantages and disadvantages of not testifying. Bahtuoh also testified that he felt that he had no choice about whether to testify, which conflicted with his testimony that his attorney never "made" him do anything.

Second, the postconviction court observed that Bahtuoh's postconviction testimony was inconsistent with his statements at the waiver colloquy at trial. During the colloquy at trial, defense counsel explained to Bahtuoh that he had the right to testify, that only he could waive that right, that the jury could not consider his silence in determining guilt, and that if he testified he would be subject to cross-examination. Bahtuoh's response demonstrated that he understood the consequences of waiver and that he nevertheless had made the decision "not [to] testify." To ensure that

---

1. This case involves the unusual situation in which a district court's error, if any, benefited the criminal defendant. Therefore, it may be just as accurate to characterize our holding in the following terms: even if the district court erred, any error favored Bahtuoh and therefore did not affect his substantial rights.

Indeed, even though no reversible error exists in this case, we encourage district courts to separately instruct the jury on accomplice liability and the underlying substantive offense because of the different state-of-mind requirements for criminal liability as a principal rather than as an accomplice. This case demonstrates the dangers of conflating the two instructions. Here, the district court instructed the jury that Bahtuoh had to possess the intent to kill Parker, rather than the lesser state of mind of knowledge that McGee would commit a crime. In contrast, a properly instructed jury could have found that Bahtuoh possessed the requisite state of mind for accomplice liability so long as Bahtuoh knew that McGee planned to commit a crime against Parker and Bahtuoh intended his actions to further the commission of that crime.

Bahtuoh understood his rights and that the waiver had not been coerced, the district court then asked Bahtuoh to confirm his decision again on the record: "Mr. Bahtuoh, to make it totally clear, this is your absolute right, it's nothing that your attorney decides. It's your decision. So you understand that?" Bahtuoh responded, "[y]es." At the postconviction hearing, however, Bahtuoh's testimony was different; he said that he did not know "that the decision to testify or not to testify was [his] decision to make" and that he thought that defense counsel "had already made the decision for [him] and . . . it was final."

We conclude that the postconviction court's finding that Bahtuoh's postconviction testimony lacked credibility was not clearly erroneous. *See State v. Hokanson,* 821 N.W.2d 340, 357 (Minn.2012) ("We review a postconviction court's . . . factual findings for clear error."). Accordingly, because the court rejected the only evidence supporting Bahtuoh's claim, Bahtuoh did not prove that the waiver of his right to testify was either unknowing or involuntary.

## V.

■ The fourth question presented by this case is whether Bahtuoh's trial counsel was ineffective when he told the jury during his opening statement that Bahtuoh would testify and then later advised Bahtuoh not to testify during the trial.[2] We review claims of ineffective assistance of counsel de novo. *Williams v. State,* 764 N.W.2d 21, 29 (Minn.2009). To prevail on a claim of ineffective assistance of trial counsel, Bahtuoh must show two things: (1) that trial counsel's performance

fell below an objective standard of reasonableness; and (2) that a reasonable probability exists that, but for trial counsel's errors, the outcome of the proceeding would have been different. *See id.* at 29; *accord Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■ In his opening statement, Bahtuoh's trial counsel stated on four occasions that Bahtuoh would testify and previewed aspects of his anticipated trial testimony. Specifically, trial counsel stated:

> You also know that Mr. Bahtuoh has a right to remain silent. He will waive that right. He made three statements to the police. He testified before the grand jury under oath. And he's going to talk to you during this trial. And he is going to tell you the truth. . . .

> He also has a conviction for an aggravated robbery, and he'll tell you about that as well. . . .

> Mr. Bahtuoh will tell you how Lamont McGee came to get into his car, and why Mr. Bahtuoh had a good reason to believe that Lamont McGee was not armed that day. It turns out that he was armed that day, but Mr. Bahtuoh did not know that at the time they were driving around. . . .

> I would ask you to keep an open mind, to continue to presume Mr. Bahtuoh innocent, wait for the whole trial to unfold before you. Wait until he takes the stand and tells you what happened.

Contrary to these statements, Bahtuoh did not testify.

---

**2.** Bahtuoh also argues that trial counsel was ineffective when he failed to object to the district court's accomplice-liability jury instruction. However, in light of our conclusion in Part III that the jury instructions,

considered as a whole, did not constitute reversible error, we need not address whether trial counsel was ineffective in failing to object to the instruction.

Bahtuoh must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052; *Williams*, 764 N.W.2d at 29. In this case, however, Bahtuoh has not identified any credible evidence indicating that, when defense counsel made his opening statement, he knew or should have known that Bahtuoh was unlikely to testify. Rather, the record suggests that, when defense counsel made his opening statement, defense counsel reasonably expected that Bahtuoh *would* testify. Because Bahtuoh had previously waived his right to remain silent and spoken both to the police and to the grand jury, and in fact intended to testify at trial, it was reasonable for defense counsel to believe, at the time of his opening statement, that Bahtuoh would testify.

Had Bahtuoh taken the stand, defense counsel's representations in his opening statement would not have prejudiced Bahtuoh and may well have benefited him by explaining to the jury how Bahtuoh's testimony would fit into the defense theory of the case. It is only in hindsight, with the knowledge that Bahtuoh did *not* testify, that defense counsel's representations in his opening statement appear imprudent. But we have cautioned against relying on hindsight when reviewing decisions made by trial counsel. *See, e.g., State v. Jones*, 392 N.W.2d 224, 236 (Minn.1986) (stating that "trial tactics should not be reviewed by an appellate court, which, unlike the counsel, has the benefit of hindsight"). Although defense counsel took a risk when he told the jury in his opening statement that Bahtuoh would testify—a risk that hindsight shows was unwise—making that representation was not objectively unreasonable at the time.

In his closing statement, trial counsel explained to the jury why Bahtuoh declined to testify despite counsel's earlier promises that he would do so:

> One of the things I want to get straight right away is that Mr. Bahtuoh did not take the stand. I told you he would. That's my fault. However, why should I put him on the stand? Why should I? When they didn't prove their case and you got his grand jury testimony read to you, which he gave under oath, read to you, which exonerates him. Why would I put a 20–year–old young man up against an experienced prosecutor? I'm not going to do that. Because when you start doing that, you may start weighing, well, we don't like his mannerisms, we don't like him. We don't like the way he sat in the chair. Any number of things you could—you start taking the burden of proof away from the government and putting it on the defense. There was no need to put him on the stand because the government didn't prove their case and his truthful story came across in his grand jury testimony. . . . And as I said before, trials are live, they're not rehearsed.

Thus, the record establishes that trial counsel weighed the risks of Bahtuoh testifying against the risks associated with failing to fulfill the representations that he made to the jury during his opening statement. And trial counsel weighed those risks in light of new information—the strength of the State's case—that he did not know at the beginning of trial. On these facts, therefore, we cannot say that trial counsel's performance fell below an objective standard of reasonableness.

Rather than providing specific facts to support his claim that trial counsel's performance was deficient, Bahtuoh cites *Ouber v. Guarino*, 293 F.3d 19 (1st Cir. 2002), in support of his claim. In *Ouber*, the United States Court of Appeals for the First Circuit held that it was objectively

unreasonable for defense counsel to promise the jury during his opening statement that the defendant would testify and then later advise the defendant not to take the stand. *See id.* at 27. *Ouber,* however, involved a unique set of facts. The defendant in *Ouber* was in the midst of his third trial when his attorney, who had served as defense counsel in the two previous trials—both of which had ended in jury deadlock—decided not to call the defendant as a witness. *See id.* at 22–23. The court noted that the failure to call the defendant as a witness—especially in light of the promise made by defense counsel at the beginning of trial *and* the fact that both previous trials had ended in jury deadlock after the defendant had testified—was not a "reasonable strategic choice" under the circumstances. *Id.* at 32.

Describing *Ouber* reveals its distinguishing facts. First, trial counsel in this case did not build the entire defense around Bahtuoh's testimony. To be sure, trial counsel's representations to the jury in this case are similar to the representations made by defense counsel during the opening statement in *Ouber.* However, in *Ouber,* defense counsel made the defendant's trial testimony the central focus of the case when he called 24 character witnesses to testify about the defendant's reputation for veracity. *Id.* at 28 n. 4. Nothing similar occurred here.

■ Second, this case does not have a lengthy procedural history involving multiple trials. As *Ouber* explains, a decision to advise the defendant not to testify, even after trial counsel promised the jury that he would testify, might be reasonable if counsel made such a decision in response to "unexpected developments" at trial. *See id.* at 29. However, in *Ouber,* the trial proceeded as anticipated, and the "situation that confronted the attorney when he changed his mind about the desirability of presenting the [defendant's] testimony was no different from the situation that existed at a comparable stage of the earlier trials." *Id.; see also Washington v. State,* 989 A.2d 94, 103 (R.I.2010) (noting that the attorney in *Ouber* "reneged in the face of his personal experience in the two previous trials"). In this case, by contrast, trial counsel reached the conclusion that the State had failed to prove its case and, unlike in *Ouber,* trial counsel had no way to know how the jury would react to Bahtuoh's testimony. And, in contrast to *Ouber,* we have no reason in this case to doubt the sincerity of trial counsel's view that developments at trial dictated his change of approach.[3] *Contra Ouber,* 293 F.3d at 27 (observing that no one had "managed to identify any benefit to be derived" from counsel's change of approach, which created doubt as to whether it was "part and parcel of a reasoned strategy"). *Ouber,* therefore, has limited persuasive value here.

Accordingly, because we conclude that trial counsel's performance did not fall below an objective standard of reasonableness, Bahtuoh was not deprived of his right to the effective assistance of trial counsel.[4]

---

**3.** To the extent that Bahtuoh's ineffective-assistance-of-counsel claim involves matters of trial strategy, we do not second-guess trial counsel's decisions about trial strategy. *See, e.g., Andersen v. State,* 830 N.W.2d 1, 13 (Minn.2013) (rejecting an ineffective-assistance claim and observing that the "conduct at issue arguably falls within trial strategy and therefore is not reviewable"). Indeed, the record indicates that defense counsel sincerely believed that, as a matter of trial strategy, Bahtuoh did not need to testify because the State had failed to prove its case.

**4.** Because Bahtuoh has not shown that trial counsel's performance fell below an objective standard of reasonableness, we need not, and do not, analyze the second requirement for an

## VI.

The fifth question presented by this case is whether the district court abused its discretion when it denied Bahtuoh's motion for a mistrial. We review the denial of a motion for a mistrial for an abuse of discretion because the district court is in the best position to evaluate the prejudicial impact, if any, of an event occurring during the trial. *State v. Manthey*, 711 N.W.2d 498, 506 (Minn.2006).

Bahtuoh moved for a mistrial after the court reporter read portions of Bahtuoh's grand-jury testimony into the record during the State's case. The testimony to which Bahtuoh objected placed him at the scene of another shooting on the same evening as Parker's murder. Specifically, the court reporter read a passage of Bahtuoh's grand-jury testimony in which Bahtuoh discussed an incident that had occurred earlier that evening: "I went to go use the bathroom, I washed my hands, and as I was coming back to the door, a car came around the corner and fired." Despite the State's intent to redact all references to the earlier incident, it mistakenly failed to redact the reference read by the court reporter. Once the court reporter read the disputed testimony, the State immediately drew the mistake to the attention of the district court and made additional redactions before the court reporter read the remainder of Bahtuoh's grand-jury testimony. Bahtuoh argues that the district court committed reversible error when it refused to declare a mistrial in light of the highly prejudicial nature of the passage read to the jury that placed him at the scene of another shooting shortly before McGee shot Parker and provided a possible motive for Bahtuoh to assist McGee in shooting Parker.

Bahtuoh's argument centers on whether the district court abused its discretion when it concluded that there was not a reasonable probability that the outcome of the trial would have been different had the event that prompted the motion for a mistrial not occurred. *See State v. Spann*, 574 N.W.2d 47, 53 (Minn.1998) (articulating the standard for declaring a mistrial). We conclude that the district court did not abuse its discretion for three reasons.

First, the disputed reference was isolated and brief: it was uttered only once during the course of a 4–day trial. *See Mahkuk*, 736 N.W.2d at 689 (concluding that the district court did not abuse its discretion by declining to declare a mistrial in part because the prejudicial testimony comprised only "two words in nearly 1,000 pages of transcript"). Bahtuoh does not identify any other portion of the record in which the State, or anyone else, referred to the alleged shooting incident that occurred earlier in the evening.

Second, as discussed in Part II, the State's case against Bahtuoh was strong. *See State v. Bickham*, 485 N.W.2d 923, 925 (Minn.1992) (assessing the strength of the evidence in concluding that the district court did not abuse its discretion in denying the defendant's motion for a mistrial). The State's evidence included, among other things, repeated calls from Bahtuoh's cell phone to known members of Bahtuoh's gang, which was a rival of Parker's gang; Bahtuoh's failure to object or otherwise express surprise immediately before, during, or after the shooting; Bahtuoh's lies to the police and his girlfriend's family;

ineffective-assistance-of-counsel claim: whether trial counsel's performance prejudiced Bahtuoh. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052 (noting that "there is no rea- son for a court ... to address both components of the inquiry if the defendant makes an insufficient showing on one"); *accord Williams*, 764 N.W.2d at 30.

and Bahtuoh's disposal of the evidence from Parker's shooting.

Third, as the State observes, the jury acquitted Bahtuoh of both counts of first-degree premeditated murder. Bahtuoh's acquittal on those counts suggests that jury did not conclude, as Bahtuoh suggests, that a shooting earlier in the day prompted Bahtuoh to retaliate by aiding McGee in the premeditated shooting of Parker. *See State v. Prtine,* 784 N.W.2d 303, 316 (Minn.2010).

Accordingly, because the reading of the disputed passage by the court reporter resulted in only minimal, if any, prejudice to Bahtuoh, the district court did not abuse its discretion when it denied Bahtuoh's motion for a mistrial.

## VII.

In his pro se supplemental brief, Bahtuoh raises the sixth and seventh questions presented by this case: whether the postconviction court erred when it denied an evidentiary hearing to Bahtuoh on his claim that the district court deprived him of his constitutional right to a public trial, and whether the jury returned legally inconsistent verdicts. Both of Bahtuoh's claims lack merit.

Bahtuoh asserts in his pro se supplemental brief that, before A.M.'s testimony, "[t]he entire audience was . . . excused and there were two guards at the door making sure no one entered." He further asserts that the audience did not return to the courtroom until A.M. finished his testimony. The evidence accompanying Bahtuoh's postconviction petition, however, provides insufficient support for Bahtuoh's assertions, and Bahtuoh concedes that the trial transcripts contain "nothing indicating any of this."

We have long held that "[a]llegations in a postconviction petition 'must be more than argumentative assertions without factual support.'" *See Schleicher v. State,* 718 N.W.2d 440, 444 (Minn.2006) (quoting *Hodgson v. State,* 540 N.W.2d 515, 517 (Minn.1995)). Here, Bahtuoh does not identify—and the record does not contain—any factual basis to support the alleged violation of his public-trial right. At most, Bahtuoh's evidence—his own affidavit and an affidavit from an investigator who spoke to A.M.—indicate that no spectators were in the courtroom when A.M. testified. But the mere fact that the courtroom was empty of spectators, even if it is true, is insufficient to show that the district court violated Bahtuoh's constitutional right to a public trial. Accordingly, the postconviction court did not err when it denied an evidentiary hearing to Bahtuoh on his public-trial claim. *See Riley v. State,* 819 N.W.2d 162, 167 (Minn.2012); Minn.Stat. § 590.04, subd. 1 (2012) (an evidentiary hearing is unnecessary when "the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief").

Bahtuoh also argues that the jury's verdicts acquitting him of two counts of first-degree premeditated murder are legally inconsistent with the jury's guilty verdicts on the remaining counts. More specifically, he asserts that either he knew the crime was going to occur, in which case it was premeditated, or he did not know it was going to occur, in which case he could not be guilty of any count. Whether a jury's verdicts are legally inconsistent is a question of law that we review de novo. *State v. Leake,* 699 N.W.2d 312, 325 (Minn.2005).

Whether a jury's verdicts are *legally* inconsistent is a different question than whether they are *logically* inconsistent. *Id.* at 326 (denying a new trial because the jury's verdicts were "not legally inconsistent," even though logical inconsis-

tencies existed). As a general rule, "[n]othing in the constitution requires consistent verdicts." *Id.* at 325. Indeed, "a defendant who is found guilty of one count of a two count indictment or complaint is not entitled to a new trial or a dismissal simply because the jury found him not guilty of the other count, even if the guilty and not guilty verdicts may be said to be logically inconsistent." *State v. Juelfs*, 270 N.W.2d 873, 873–74 (Minn.1978); *see also Leake*, 699 N.W.2d at 325 (quoting *Juelfs*, 270 N.W.2d at 873–74). Instead, we have reversed convictions based upon legal inconsistency only in cases involving multiple *guilty* verdicts that are inconsistent with one another, not in cases of alleged conflict between guilty and not-guilty verdicts. *Leake*, 699 N.W.2d at 326 (discussing cases about inconsistent verdicts). In this case, because Bahtuoh asserts only logical inconsistencies—that is, inconsistencies between the not-guilty verdicts on two counts and the guilty verdicts on four counts—the verdicts are not legally inconsistent and Bahtuoh is not entitled to a new trial. *See id.*

## VIII.

For the foregoing reasons, we affirm Bahtuoh's conviction of first-degree felony murder while committing a drive-by shooting for the benefit of a gang.

Affirmed.

LILLEHAUG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

