*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1928**

State of Minnesota,
Respondent,

vs.

Timothy John Huber,
Appellant.

**Filed December 8, 2014
Affirmed
Chutich, Judge
Dissenting, Stauber, Judge**

Kandiyohi County District Court
File No. 34-CR-11-817

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, St. Paul, Minnesota; and

Shane Baker, Kandiyohi County Attorney, Willmar, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Julie Loftus Nelson, Special Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Stauber, Presiding Judge; Cleary, Chief Judge; and Chutich, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CHUTICH**, Judge

On appeal from his conviction for aiding and abetting second-degree murder, appellant Timothy John Huber contends, and we agree, that the district court committed

plain error by improperly instructing the jury on accomplice liability. Because Huber cannot meet his heavy burden of showing that the error affected the outcome of his case, and because he had a full opportunity to present his theory of the case in a vigorous and fair adversarial trial, we nevertheless affirm Huber's conviction.

## FACTS

The facts underlying T.L.'s murder are as follows. Appellant Timothy John Huber and his father, 80-year-old Delbert Huber, owned land in rural Kandiyohi County. Huber occasionally performed chores at the farm of his neighbor, N.L. N.L.'s son, T.L., also owned land adjacent to N.L.'s farm, which T.L. used for hunting. T.L. was a special education teacher who lived in Albertville; when T.L. hunted on his land, he stayed at his father's farm.

The record shows that Huber had a long-standing antipathy toward T.L. dating back to 2005 and had been harassing him over the years. Huber believed that T.L. had once permitted other people to hunt on the Hubers' land, which angered him. He frequently accused T.L. of neglecting T.L.'s father and called T.L. and his wife "rich city people."

Huber made numerous telephone calls to T.L. until T.L. sent him a letter asking him to stop. T.L. filed a police report in 2008, claiming that Huber was harassing him by making phone calls "at all hours." Even though T.L. lived in Albertville, not close to the farms in Kandiyohi County, Huber and Delbert Huber inexplicably believed that T.L. drove to Paynesville to puncture their tires, shine lights into their house in the middle of the night, turn lights on in the barn at 1:00 a.m., cut wires to let cattle out of the fence,

2

and do "everything he could" to harass them. Although Huber and Delbert Huber attributed these acts to T.L., no credible evidence tied T.L. to any of these purported events. Other evidence, including a series of letters addressed to T.L.'s father expressing Huber's anger and frustration with T.L., and *Spreigl* testimony regarding Huber's profanity-laced and threatening interactions with personnel at the Veterans Administration Hospital, demonstrate that Huber reacted with anger and paranoia in certain situations.

On October 7, 2011, a Friday night, T.L. arrived at his father's farm, planning to duck hunt that weekend by himself on the farm. T.L. did not know that his father had asked Huber to do some farm chores while T.L.'s father was out of town, and T.L. was surprised to encounter Huber at T.L.'s father's farm, along with a lot of Huber's farm equipment. T.L. asked Huber to leave several times and to remove his farm equipment, but Huber refused. Finally, Huber, Delbert Huber, and a neighbor moved the equipment off N.L.'s farm but the neighbor described Huber as very angry—as angry as he had ever seen him. Huber reportedly told Delbert Huber that T.L. said he would kill them if they returned to N.L.'s land.

During this encounter, T.L. told Huber that T.L. would do the chores at the farm, and he specifically instructed Huber not to return the next day. Despite this directive and T.L.'s purported threat to kill them, Huber and Delbert Huber returned the very next morning. Delbert Huber, who did not usually carry a gun, brought a World War I British military rifle and ammunition and put them in the trunk of the car. The gun had been recently oiled and was fully operational.

When they arrived at N.L.'s farm, no one was there. Instead of doing chores, the Hubers drove to check on the farm equipment that they had removed from N.L.'s property the night before. Huber told Delbert Huber that someone had turned on the lights of the equipment and had tampered with the oil in the tractors. Huber blamed T.L. for tampering with the tractors; evidence at trial showed, however, that the equipment had not been vandalized. Huber also told Delbert Huber that T.L. had likely taken Huber's wallet and stolen $50 and that T.L. had taken tractor parts.

After checking on the equipment, Huber and Delbert Huber returned to N.L.'s farm. On the way, Delbert Huber instructed Huber to stop the car so that he could retrieve the rifle from the trunk. Delbert Huber intended to force T.L. to admit that he had stolen the wallet and the tractor parts. Huber testified that he was doing chores, while Delbert Huber waited in the car, when T.L. returned in his pickup truck. Huber said that T.L. was shouting and hollering at them; T.L. was not armed, but Huber testified that T.L. and Delbert Huber engaged in a "ballroom brawl" and wrestling match; Delbert Huber "quick ran" or walked fast to the car, retrieved the rifle, and shot T.L., killing him with a single shot. At the time of this encounter, Delbert Huber used a walker or a wheelchair.

Huber testified that Delbert Huber was just trying to defend himself when he shot T.L. Evidence at trial showed that T.L. was killed when the shot entered his left side, and the placement of the shot suggested that T.L. was retreating to his truck when hit.

The two men left T.L.'s body on the ground for 12 hours and did not call the police until evening. Huber testified that he did not call the police because Delbert Huber

4

had his cellular telephone, but evidence at trial showed that Huber made several telephone calls from that phone that day. Delbert Huber stated that he shot T.L. and that Huber did not call the police because Huber was busy that day. Huber's two statements to the police included contradictory statements; he claimed to have been in the barn doing chores but later claimed that Delbert Huber had shouted at him to stay away.

Huber was charged with aiding and abetting first-degree premeditated murder, second-degree intentional murder, and second-degree unintentional felony murder (murder during a second-degree assault). Delbert Huber pleaded guilty to second-degree intentional murder. After a jury trial, the jury convicted Huber of both counts of second-degree murder, but acquitted him of first-degree premeditated murder. On appeal, Huber challenges the district court's jury instruction on liability for the crimes of another.

## D E C I S I O N

Huber did not object to the jury instructions at trial so we review them for plain error. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). An appellant must show that (1) there was error; (2) it was plain; and (3) his or her substantial rights were affected. *Id.* If all three prongs are met, "we may correct the error only if it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *State v. Crowsbreast,* 629 N.W.2d 433, 437 (Minn. 2001) (alteration in original) (quoting *Johnson v. United States*, 520 U.S. 461, 467 117 S. Ct. 1544, 1549 (1997)).

Because the district court has broad discretion in formulating jury instructions, we will not reverse if the "instructions overall fairly and correctly state the applicable law." *State v. Hayes*, 831 N.W.2d 546, 555 (Minn. 2013) (quotation omitted). But a jury

5

instruction that fails to include or explain a required element of the crime is erroneous and we must then determine whether the error was plain, affected the defendant's substantial rights, and requires correction to "ensure fairness and the integrity of the judicial proceedings." *State v. Milton*, 821 N.W.2d 789, 806–07 (Minn. 2012).

The defendant has the burden of demonstrating that plain error occurred. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). As to the third prong, whether substantial rights were affected, a defendant bears "the heavy burden of proving that 'there is a reasonable likelihood that giving the instruction in question had a significant effect on the jury verdict.'" *State v. Kelley*, 855 N.W.2d 269, 284 (Minn. 2014) (quoting *State v. Gomez,* 721 N.W.2d 871, 880 (Minn. 2006)). We consider each prong of the plain-error standard in turn.

*1.    Error*

Huber was charged with aiding and abetting Delbert Huber to commit first-degree and second-degree murder. Liability for the crimes of another, or aiding and abetting, requires the state to show, in addition to the elements of the underlying offense, that a defendant played a "knowing role in the commission of the crime." *State v. Gates*, 615 N.W.2d 331, 337 (Minn. 2000), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004). To do so, the state had to prove beyond a reasonable doubt that Huber knew Delbert Huber was going to commit a crime and that Huber "intended his presence or actions to further the commission of that crime." *State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn. 2007).

6

In *Mahkuk*, the supreme court concluded that the district court's instruction that the jury must "consider" whether the defendant knew a crime would be committed and whether he intended to encourage or further the crime by his presence was erroneous. *Id.* The supreme court stated that a jury must do more than "consider" these factors; it must find them beyond a reasonable doubt. *Id.*

Following *Mahkuk*, the supreme court held that a district court must include in its jury instructions on accomplice liability that (1) the defendant knew that his alleged accomplice was going to commit a crime, and (2) the defendant intentionally assisted in that crime. *Milton*, 821 N.W.2d at 805-06. Although the district court in *Milton* instructed the jury that it must find that the defendant "intentionally aided" his accomplice, the supreme court concluded that the district court failed to provide an explanation of what "intentionally aiding" meant. *Id.* at 807. That is, the district court failed to instruct the jury that it had to find beyond a reasonable doubt that (1) Milton knew his accomplices were going to commit a crime, and (2) Milton intended by his presence to further the commission of the crime. *Id.* at 806.

Here, the district court instructed the jury as follows for each of the three murder charges:

> Liability for Crimes of Another. The Defendant is guilty of a crime committed by another person when the Defendant has intentionally aided the other person in committing it, or has intentionally advised, hired, counseled or conspired with, or otherwise procured the other person to commit it.

7

In addition to this instruction on liability for the crimes of another, the district court instructed the jury as follows on intent as to the crime of second-degree intentional murder:[1]

> Timothy Huber, or Delbert Huber aided and abetted by Timothy Huber, acted with the intent to kill [T.L.]. To find Timothy Huber, or Delbert Huber aided and abetted by Timothy Huber, had an intent to kill, you must find that Timothy Huber, or Delbert Huber aided and abetted by Timothy Huber, acted with the purpose of causing death, or believed that the act would have that result.

The district court further instructed the jury that all elements of the charge must be proved beyond a reasonable doubt. As to the charge of second-degree murder while committing a felony, the jury was instructed that Huber, or Delbert Huber aided by Huber, intended to commit the underlying felony offense of second-degree assault and that this intent must be proved beyond a reasonable doubt.

During deliberations, the jury asked for clarification about the meaning of "aiding and abetting." The jury instructions defined "liability for the crimes of another," but the instructions on the elements of the offenses used the language "aiding and abetting." The district court explained that "aiding and abetting" was simply a shorthand way of saying "liability for the crimes of another." It then reread a portion of the instruction concerning "liability for the crimes of another." *See* 10 *Minnesota Practice*, CRIMJIG 4.01 (2006).

Read in conjunction, the instructions on liability for the crimes of another and the intent element of the murder charges do not suffer from the same flaw as the *Mahkuk* instruction. The jury was instructed to find each element of the offense beyond a

---

[1] The district court also gave a similar instruction for first-degree murder.

8

reasonable doubt, and not just to "consider" whether presence at the scene of the crime was aiding and abetting.  But these instructions do not include the additional statements required by *Milton*; even though the district court gave a portion of the standard jury instructions for "liability for the crimes of another," the failure to explain what "intentionally aiding" means is error.  *See Kelley*, 855 N.W.2d at 275 (holding that, after *Milton*, failure to define the phrase "intentionally aids" when giving the standard accomplice liability jury instruction is plain error).

The state contends nevertheless that the instructions here are similar to those found sufficient by the supreme court in *State v. Bahtuoh*, 840 N.W.2d 804, 813 (Minn. 2013). In *Bahtuoh*, the defendant made the same objection Huber makes here: the district court failed to instruct the jury that the defendant must know that his accomplice planned to commit a crime and that he intended by his presence to further the commission of the crime.  *Id.* at 811.  The supreme court noted that the district court did not include this language from *Milton*, but concluded that, as given, the instructions required the jury to find that the defendant had a "*more* culpable state of mind than is required for accomplice liability under Minnesota law."  *Id.* at 814.

The *Bahtuoh* instruction for first-degree murder stated:

> [T]he defendant, acting alone or intentionally aiding and abetting another, acted with the intent to kill [the victim]. To find the defendant had an intent to kill, you must find that the defendant acted with the purpose of causing death or believed that the act would have that result.

*Id.* (emphasis omitted).  The supreme court reasoned that this language did not include the flaw in *Mahkuk*, in which the jury was instructed to "consider" whether the defendant

9

knew a crime would be committed and whether the defendant intended to encourage completion of the crime; this language effectively relieved the state from the burden of proving intent. *Id.* at 813. Even though the *Milton* language was omitted, the supreme court concluded that the requirements of *Milton* were satisfied because it was clear the defendant had to play a knowing role in the commission of the crime. *Id.* at 814–15.

After careful analysis, we conclude that the instructions here are not similar enough to those in *Bahtuoh* to meet the requirements of *Milton.* Unlike *Bahtuoh,* where the instructions required the jury to find that Bahtuoh himself "acted with the intent to kill," *id.* at 814, regardless of whether it found that he acted as an accomplice or principal, the instructions provided here did not require that same intent. Moreover, unlike *Bahtuoh,* where the word "intentionally" appeared directly before "aiding and abetting," *id.*, the instructions here contained no such clear directive before the critical "aiding and abetting" language. And *Bahtuoh* contained additional language that "reinforced the requirement that the jury had to find that Bahtuoh intended his actions to further the commission of the crime." *Id.*

In sum, the challenged instructions do not include the required *Milton* language that Huber knew Delbert Huber was going to commit a crime and intended his presence or actions to further commission of the crime. Nor did the instructions contain language that would exceed the *Milton* requirements or necessarily ensure that they were met, as in *Bahtuoh.* Accordingly, we conclude that the jury instructions were erroneous.

10

### 2. *Plain error*

In considering whether the jury instructions given here were plainly erroneous, we examine the law in existence at the time of appellate review. *Kelley,* 855 N.W.2d at 277. Because *Milton* was decided several months before Huber's trial, the failure to comply with the *Milton* rule is plain error. *See id.* at 275 (concluding that failure to define the phrase "intentionally aids" when giving the standard accomplice liability jury instruction is plain error).

### 3. *Substantial rights*

The third prong of the plain-error doctrine requires Huber to show that his substantial rights were affected by the error.

> The third prong, requiring that the error affect substantial rights, is satisfied if the error was prejudicial and affected the outcome of the case. The defendant bears the burden of persuasion on this third prong. [Appellate courts] consider this to be a heavy burden. [Plain error is prejudicial] if there is a reasonable likelihood that the giving of the instruction in question would have had a significant effect on the verdict of the jury.

*Griller*, 583 N.W.2d at 741 (quotation and citations omitted). In *Kelley*, the supreme court analyzed this prong by noting that "[a]n erroneous jury instruction will not ordinarily have a significant effect on the jury's verdict if there is considerable evidence of the defendant's guilt." 855 N.W.2d at 283–84.

Applying these principles here, we conclude that Huber failed to meet his heavy burden of showing that the erroneous instruction had a significant effect on the verdict of guilty. First, the record shows that Huber directly and vigorously contested the aiding-

and-abetting element and offered evidence to the contrary.[2]  Huber claimed that he was not aware that Delbert Huber would shoot T.L., he was not present when the argument between T.L. and Delbert Huber started, and T.L. was the aggressor and Delbert Huber acted in self-defense.

Second, during deliberations, the jury asked the court for a definition of "aided and abetted."  The district court explained that aiding and abetting was older terminology for liability for the crimes of another and read the jury instruction explaining when a person is liable for the crimes of another.  It is clear from the jury's question that it considered this element of the crime.

Most critically, however, the state offered weighty and convincing evidence to show that it was Huber, and not his father, who had a motive to kill T.L.; that Huber knew that his father intended to commit, at the very least, second-degree assault against T.L.; and that Huber intended, by his many actions on Friday and Saturday, to further the commission of the crime against T.L.

The state's powerful evidence included these facts: (1) Huber had a lengthy history of ill will toward T.L., which included harassing letters and phone calls; (2) Huber was extremely angry at T.L. after T.L. told him to leave the farm and remove

---

[2]  We note that both counsel described the specifics of aiding and abetting liability to the jury in their closing arguments.  The prosecutor stressed Huber's active involvement in the crime, stating that Huber is "equally responsible" for the killing because "Delbert Huber would not have done this without the participation of the Defendant and "[b]ut for the contributions of Timothy Huber this murder would not have happened."  The defense stressed the knowledge that must be proved beyond a reasonable doubt: "So basically what you're left with is did Tim Huber aid and abet a man that he knew was going to do a premeditated murder.  Okay.  That he intentionally aided somebody who he [knew] was gonna do a premeditated murder."

12

his farm equipment; (3) Huber sought to anger Delbert Huber as well when he falsely told Delbert Huber that T.L. had stolen money from him, damaged the farm equipment, harassed him, and said that he was going to kill them if they returned to N.L.'s farm; (4) Huber had been specifically instructed not to return to N.L.'s farm, but he did so twice on the day of the murder; (5) when Huber discovered T.L. was not at the farm the first time he arrived that morning, he left and returned again later; (6) Huber knew his father brought a gun with him, although Delbert Huber did not usually carry a gun; (7) Huber stopped the car so that Delbert Huber could retrieve the gun from the trunk before they returned to the farm the second time; (8) Huber changed his description of the shooting between his first and second interview with police; (9) Huber lied about when the shooting occurred and the availability of his cellphone; (10) Huber and Delbert Huber left T.L.'s body at N.L.'s farm for 12 hours before contacting police; and (11) Huber's testimony in general was not credible, including his description of a brawl between Delbert Huber and T.L., his insistence that he stayed in the barn doing chores despite the altercation and a gunshot, and his claim that he failed to report the shooting to police because he was busy.

This evidence was strong enough to show that Huber was not an unwitting bystander but acted knowingly and intentionally to further his father's crime against T.L. Accordingly, we conclude that Huber fails to meet his heavy burden of showing that his substantial rights were affected by the error in the jury instructions.

4.      *Fairness and the integrity of the judicial proceedings*

Because Huber failed to satisfy this third prong of the plain-error test, we need not consider the final requirement of plain-error analysis, whether the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 469–70, 117 S. Ct. at 1550 (alteration in the original) (quotation omitted); *see Griller*, 583 N.W.2d at 742 (adopting analysis of *Johnson*). We note, however, that in *Griller*, the supreme court reasoned that Griller had a complete adversarial trial and was permitted to present his theory of self-defense, and the jury considered and rejected his "far-fetched version of events." 583 N.W.2d at 742. Under these circumstances, the supreme court held that it would be "an exercise in futility and a waste of judicial resources" to grant Griller a new trial based on an erroneous jury instruction. *Id.* Because Huber also had a complete adversarial trial and presented his theory of the case and his defenses, and the jury was permitted to consider these defenses, we do not believe that a new trial is necessary to ensure the fairness and the integrity of judicial proceedings, even if Huber had successfully shown all three prongs of the plain-error analysis.

**Affirmed.**

**STAUBER,** Judge (dissenting)

I respectfully dissent. Despite the considerable latitude given to the district court in formulating jury instructions, an instruction, when viewed in its entirety, "must fairly and adequately explain the law of the case." *State v. Koppi*, 798 N.W.2d 358, 362 (Minn. 2011). "It is well settled that jury instructions *must* define the crime charged and explain the elements of the offense to the jury." *State v. Vance*, 734 N.W.2d 650, 656 (Minn. 2007) (emphasis added), *abrogated on other grounds by State v. Fleck*, 810 N.W.2d 303 (Minn. 2012).

When a defendant is charged with aiding and abetting another in the commission of a crime, the state must prove "beyond a reasonable doubt that [the defendant] (1) knew his alleged accomplice[] [was] going to commit a crime, and (2) intended his presence to further the commission of that crime." *State v. Milton*, 821 N.W.2d 789, 806 (Minn. 2012). Mere presence, failure to intervene, or failure to report a crime is not sufficient; proof of "the 'intentionally aiding' element requires knowing and intentional assistance in the underlying crime." *Id.* at 807.

The majority here agrees that the district court plainly erred by failing to instruct the jury that Huber had to know that Delbert Huber was going to commit a crime and intend to assist him, but then concludes that Huber fails to show that his substantial rights were affected. But "[a]n error affects a defendant's substantial rights if there is a 'reasonable likelihood' that the error had a 'significant effect' on the jury's verdict." *Id.* (quotation and citation omitted). Not only did the district court omit an explanation of an essential element of the charged offense by failing to explain what proof is required, but

DS-1

it is also clear that the jury was confused: the jury submitted a question asking for an explanation on precisely this element of the charged offense.

Unlike the defendant in *Milton*, the evidence that Huber knew Delbert Huber would commit a crime and intentionally assisted him to do so is not overwhelming. Huber's statement places him in the barn doing chores during the altercation between Delbert Huber and T.L.; the chance that the 80-year-old Delbert Huber, whom Huber left sitting in the car, would take a World War I era rifle and attack a much younger and fitter man after a bout of fisticuffs seems remote. On such thin evidence, we should not assume that the lack of a proper instruction did not have a significant effect on the jury's verdict. In *State v. Watkins*, the supreme court concluded that even though the defendant's defense was "questionable," "the district court's erroneous instruction prevented the jury from considering [the defendant's] primary defense in rendering its verdict." 840 N.W.2d 21, 31 (Minn. 2013). The supreme court determined that "allowing the jury to consider [his] defense will protect the fairness, integrity, and public reputation of the judicial proceedings." *Id.* When the stakes are as high as they are in this case, we should reverse Huber's conviction to permit a properly instructed jury to consider the evidence.