STATE OF MINNESOTA

IN SUPREME COURT

A14-0460

Court of Appeals                                                            Gildea, C.J.
                                                              Took no part, Chutich, J.

State of Minnesota,

                        Respondent,

vs.                                                            Filed:  June 29, 2016
                                                              Office of Appellate Courts

Antonio Dion Washington-Davis,

                        Appellant.

_____


Lori Swanson, Attorney General, Saint Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Kaarin Long, Assistant Ramsey County Attorney, Saint Paul, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

Cort C. Holten, Jeffrey D. Bores, Gary K. Luloff, Chestnut Cambronne P.A., Minneapolis, Minnesota for amicus curiae Minnesota Police and Peace Officers Association Legal Defense Fund.

_____


S Y L L A B U S

1.     Minnesota Statutes § 609.322, subd. 1a(1)-(2) (2014), which criminalizes the promotion of prostitution and the solicitation of individuals to practice prostitution, is not substantially overbroad in violation of the First Amendment.

1

2.    The district court's plainly erroneous accomplice-liability jury instructions did not affect the appellant's substantial rights.

3.    The circumstantial evidence was sufficient to convict appellant of aiding and abetting the solicitation of two women to practice prostitution.

Affirmed.

O P I N I O N

GILDEA, Chief Justice.

This case arises out of a sex-trafficking operation. For his part in the operation, appellant Antonio Dion Washington-Davis was convicted of soliciting and promoting prostitution and conspiracy to commit sex trafficking.[1] Washington-Davis argues that we should reverse his convictions because the statute that criminalizes the promotion and solicitation of prostitution, Minn. Stat. § 609.322, subd. 1a(1)-(2) (2014), is facially overbroad under the First Amendment. He also argues that the district court committed reversible error by giving plainly erroneous accomplice-liability jury instructions, and that the evidence presented at trial was insufficient to establish that he intentionally aided his codefendant's solicitation of two women to practice prostitution. Because Minn. Stat. § 609.322, subd. 1a(1)-(2), is not substantially overbroad, the district court's plainly erroneous accomplice-liability jury instructions did not affect Washington-Davis's

---

[1]    Specifically, Washington-Davis was convicted of one count of first-degree solicitation to practice prostitution, Minn. Stat. § 609.322, subd. 1(a)(1) (2014); one count of second-degree solicitation to practice prostitution, Minn. Stat. § 609.322, subd. 1a(1) (2014); three counts of second-degree promotion of prostitution, Minn. Stat. § 609.322, subd. 1a(2) (2014); and one count of conspiracy to commit sex trafficking, Minn. Stat. §§ 609.175, subd. 2(3), 609.322, subd. 1a(4) (2014).

2

substantial rights, and the evidence was sufficient to support Washington-Davis's convictions, we affirm.

The actions forming the basis for Washington-Davis's convictions occurred between September 2010 and July 2012. During this period, Washington-Davis was involved in a family-operated prostitution scheme that was run out of his uncle's house in St. Paul. Washington-Davis, his brother, Otis,[2] and his uncles were all involved. The men solicited women into prostitution first by pursuing romantic relationships with them. Once each relationship was established, the men would typically tell each woman that she could make a lot of money through prostitution. After luring them into the prostitution scheme, Washington-Davis or one of his family members would take photos of the women and post advertisements depicting the women online, arrange for the women to engage in sex acts for hire at the St. Paul house, drive the women to meet customers on "out-calls" away from the St. Paul house, and keep most, if not all, of the money the women made. Although each woman reported primarily to one family member, the other family members assisted with placing ads and transporting the women to out-calls. This case involves Washington-Davis's conduct with respect to five women: J.M., B.R., S.A., C.B., and T.B. Four of them (J.M., B.R., S.A., and C.B.) testified at trial.

J.M. testified that she first met Washington-Davis in 2008 and continued to work for him through 2011. Washington-Davis took photos of J.M. while she was at his uncle's house, posted the photos in online advertisements, and set prices for her services.

---

[2] Because Otis Washington shares part of Washington-Davis's last name, we will refer to Otis by his first name.

3

Washington-Davis kept all the money from her performance of sex acts for hire, and he became verbally and physically abusive if she attempted to withhold money from him. J.M. twice went to the police to report she was being trafficked, once after being slapped, and again after Washington-Davis drove her outside of the Twin Cities, forced her to work out of a hotel room, took all the money she earned, and physically abused her. For his conduct involving J.M., Washington-Davis was convicted of one count of second-degree promotion of prostitution, Minn. Stat. § 609.322, subd. 1a(2), on an accomplice-liability theory.

Both B.R. and S.A. testified that they worked as prostitutes for Washington-Davis's uncle in 2010. Although B.R. gave all of the money she earned on calls to Washington-Davis's uncle, Washington-Davis assisted his uncle in posting advertisements for B.R. online. In fact, B.R. stated that Washington-Davis was "in charge" of posting advertisements for her and the other women. After Washington-Davis's uncle went to prison in 2011, Washington-Davis attempted to have B.R. work directly for him, but B.R. fled when he attempted to have her work out of a hotel. Washington-Davis would occasionally drive S.A. to "out-calls," and continued to do so even after S.A. stopped working for Washington-Davis's uncle. For his conduct involving B.R. and S.A., Washington-Davis was convicted of two counts of aiding and abetting second-degree promotion of prostitution, Minn. Stat. § 609.322, subd. 1a(2), on an accomplice-liability theory.

C.B. testified that she was 15 years old when she and 18-year-old T.B. met Washington-Davis and his brother, Otis. C.B. explained how she and T.B. met the men,

4

got into a car with the brothers, and went with them to Washington-Davis's uncle's house in St. Paul. Upon arriving at the house, C.B. observed three women wearing pajamas and talking on cell phones. C.B. also overheard Washington-Davis and Otis discussing how "they could probably make a lot of money" from T.B., and Otis asked both women if he and Washington-Davis could take pictures of them. Although Otis did most of the talking, Washington-Davis was present during these conversations.

According to C.B., after the discussion about taking photos, Washington-Davis left the house with two of the other women, who had since changed out of their pajamas. When C.B. asked Otis where Washington-Davis and the women had gone, Otis replied, "to go make money." Otis then explained that "they [Washington-Davis and Otis] place ads on Backpage and that [the women] use the phones . . . for the people to call them, and then [Washington-Davis] gives them a ride to where they are going." Otis told C.B. that he initially wanted her to go with Washington-Davis and the other women, but that he and Washington-Davis decided C.B. should follow Otis and T.B. instead. Otis then brought C.B. and T.B. along with him and another woman. When the third woman went on two out-calls, Otis tried to convince C.B. to work for him. For his conduct involving C.B., Washington-Davis was convicted of one count of first-degree solicitation to practice prostitution, Minn. Stat. § 609.322, subd. 1(a)(1), on an accomplice-liability theory. For his conduct involving T.B., Washington-Davis was convicted of one count of second-degree solicitation to practice prostitution, *id.*, subd. 1a(1), again on an accomplice-liability theory.

In 2013, a large-scale investigation of Washington-Davis and his family members revealed a shared infrastructure of telephone numbers, credit cards, e-mail addresses, and advertisements linking the Washington family to various trafficked women from 2008 to 2013. Following the investigation, Washington-Davis was charged with six counts of prostitution promotion and solicitation and one count of conspiracy to commit sex trafficking.[3]

Before trial, Washington-Davis argued that Minn. Stat. § 609.322, subd. 1a(1)-(2), was facially unconstitutional because it burdened a substantial amount of protected speech. The district court rejected the constitutional argument and the matter proceeded to trial. When Washington-Davis testified at trial, he admitted that he knew his uncles promoted prostitution but claimed that the women Washington-Davis allegedly "pimped" prostituted themselves without his assistance.

After the jury found Washington-Davis guilty of the six counts against him, the district court convicted Washington-Davis of each count and sentenced him to a total of 432 months in prison. The court of appeals affirmed Washington-Davis's convictions.[4] *State v. Washington-Davis*, 867 N.W.2d 222, 241 (Minn. App. 2015). We granted Washington-Davis's petition for review.

---

[3] One count of prostitution promotion, not detailed above, was dropped before trial.

[4] The court of appeals reversed Washington-Davis's sentence and remanded for resentencing. *State v. Washington-Davis*, 867 N.W.2d 222, 241 (Minn. App. 2015). The portion of the court of appeals' opinion addressing Washington-Davis's sentence is not at issue before us.

On appeal to our court, Washington-Davis claims that Minn. Stat. § 609.322, subd. 1a(1)-(2), is facially overbroad under the First Amendment, the district court committed reversible error by giving plainly erroneous jury instructions, and the evidence was insufficient to support some of his convictions. We address each argument in turn.

I.

We turn first to the question of whether the promotion- and solicitation-of-prostitution statute, Minn. Stat. § 609.322, subd. 1a(1)-(2) ("promotion and solicitation statute"), is facially unconstitutional under the First Amendment. This statute makes it a crime for a person, "while acting other than as a prostitute or patron," to intentionally "solicit[] or induce[] an individual to practice prostitution" or "promote[] the prostitution of an individual."[5] *Id.* "Prostitution" is defined, in part, as "hiring, offering to hire, or

---

[5]    A person "[p]romotes the prostitution of [another]" by knowingly doing any of the following acts:

(1)    solicits or procures patrons for a prostitute;
(2)    provides, leases or otherwise permits premises or facilities owned or controlled by the person to aid the prostitution of an individual;
(3)    owns, manages, supervises, controls, keeps or operates, either alone or with others, a place of prostitution to aid the prostitution of an individual;
(4)    owns, manages, supervises, controls, operates, institutes, aids or facilitates, either alone or with others, a business of prostitution to aid the prostitution of an individual;
(5)    admits a patron to a place of prostitution to aid the prostitution of an individual; or
(6)    transports an individual from one point within this state to another point either within or without this state, or brings an individual into this state to aid the prostitution of the individual.

(Footnote continued on next page.)

7

agreeing to hire another individual to engage in sexual penetration or sexual contact."

Minn. Stat. § 609.321, subd. 9 (2014). Sexual penetration and sexual contact involve the intentional touching or intruding, however slight, "of [an] individual's intimate parts," if the touching or intruding "can reasonably be construed as being for the purpose of satisfying the actor's sexual impulses." *Id.*, subds. 10-11.

Washington-Davis acknowledges that the promotion and solicitation statute may be constitutional as applied to his specific conduct. But he argues that the statute infringes on protected speech of others not before the court. Specifically, Washington-Davis contends that the statute applies to people who promote and solicit consenting adults to participate in constitutionally protected films or photographs involving sexual contact.[6] According to Washington-Davis, not only does the statute reach individuals who hire actors to engage in sexual contact for the purpose of filming pornographic or other sexually explicit films, but it also applies to those individuals involved in production-related activities, including the transportation of actors to a film set, actor recruitment, leasing or renting space for film production, and the solicitation of film business in general.

---

(Footnote continued from previous page.)
Minn. Stat. § 609.321, subd. 7 (2014). The terms "solicit" and "induce" are not defined further in the statute. *See* Minn. Stat. § 609.321.

[6] The parties agree that Washington-Davis has standing to bring this facial challenge. *See State v. Machholz*, 574 N.W.2d 415, 419 (Minn. 1998) (noting that a defendant can facially challenge a criminal statute even though the defendant's speech is unprotected by the First Amendment). The parties also agree that Minn. Stat. § 609.322, subd. 1a(1)-(2), implicates the First Amendment. *See Machholz*, 574 N.W.2d at 420.

8

For its part, the State argues that the promotion and solicitation statute does not prohibit speech protected by the First Amendment. The statute does not reach the creation of films or photographs involving sexual contact, the State maintains, absent a showing that such a film or photograph is produced "for the purpose of satisfying the actor's sexual impulses." *See* Minn. Stat. § 609.321, subd. 10. Under the State's theory, when the State can prove a person solicited another to engage in sexual acts for the purpose of sexual gratification, such behavior is criminal regardless of whether a camera is involved.

The parties' arguments require us to address whether Minn. Stat. § 609.322, subd. 1a(1)-(2) is unconstitutionally overbroad.[7] We review constitutional challenges de novo. *State v. Melchert-Dinkel*, 844 N.W.2d 13, 18 (Minn. 2014).[8] The first step in an overbreadth analysis is to construe the challenged statute. *United States v. Williams*,

---

[7] Washington-Davis does not challenge the constitutionality of Minn. Stat. § 609.322, subd. 1(a)(1)-(2), which criminalizes the solicitation and promotion of individuals under the age of 18 to practice prostitution. He concedes that the First Amendment does not protect the production of child pornography. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245-46 (2002).

[8] It is unclear which party bears the burden to prove the statute's constitutionality. On the one hand, Minn. Stat. § 609.322, subd. 1a(1)-(2), prohibits a particular type of speech based on its content: speech used to solicit or promote an individual to practice prostitution. *See State v. Crawley*, 819 N.W.2d 94, 101 (Minn. 2012) (defining a regulation as content-based if "a person may be prosecuted under the statute [based] entirely on what the person says"). The burden is typically on the State to show that a content-based restriction does not violate the First Amendment. *See Melchert-Dinkel*, 844 N.W.2d at 18. On the other hand, the party challenging the constitutionality of a statute bears the burden to show that protected speech is implicated in the first place. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). Because the resolution of the constitutional issue in this case does not turn on the burden of proof, we need not decide this issue.

9

553 U.S. 285, 293 (2008). If the statute does not reach speech that the First Amendment protects, but instead solely regulates speech undeserving of First Amendment protection, the statute is constitutional unless it results in "content discrimination unrelated to [its] distinctively proscribable content." *State v. Crawley*, 819 N.W.2d 94, 109 (Minn. 2012) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383-84 (1992)). But if we conclude that the statute proscribes some amount of protected speech, we must then determine if the statute is substantially overbroad "in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

### A.

We first interpret the statute to determine if it regulates speech that the First Amendment protects. *See Williams*, 553 U.S. at 293. The First Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996), provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.; *accord* Minn. Const. art. I, § 3 ("[A]ll persons may freely speak, write, and publish their sentiments on all subjects . . . ."); *State v. Wicklund*, 589 N.W.2d 793, 801 (Minn. 1999) (interpreting the Minnesota Constitution's free-speech provision consistently with the First Amendment). Some categories of speech, however, are "of such slight social value as a step to truth that any benefit that may be derived from [them are] clearly outweighed by the social interest in order and morality." *Melchert-Dinkel*, 844 N.W.2d at 19 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). One such category is "speech or writing used as an integral part of conduct in violation of

10

a valid criminal statute." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949); *see also Williams*, 553 U.S. at 297 ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection." (citing *Giboney*, 336 U.S. at 498)). The State relies on this category of unprotected speech in arguing that Minn. Stat. § 609.322, subd. 1a(1)-(2), is not overbroad.

The State's argument has merit because the conduct at which Minn. Stat. § 609.322, subd. 1a(1)-(2), is aimed—prostitution—is illegal in Minnesota. *See* Minn. Stat. § 609.324 (2014). The statute's focus on speech directly related to criminal behavior makes the statute's reach similar to that of the statute at issue in *Williams*, 553 U.S. at 297 (recognizing a criminal-solicitation exception to First Amendment protection). There, the Supreme Court rejected a First Amendment challenge to a statute criminalizing the solicitation of child pornography against a claim of overbreadth because the statute made a proper distinction "between a proposal to engage in illegal activity and the abstract advocacy of illegality." *Id*. at 298-99, 307.

Minnesota Statutes § 609.322, subd. 1a(1)-(2), is similarly limited in scope. The statute does not reach abstract advocacy of prostitution or general discussions about prostitution untethered to actual criminal behavior. The statute, instead, regulates speech that is directly linked to and designed to facilitate the commission of a crime. For example, the statute criminalizes "solicit[ing] or induc[ing] an individual to practice prostitution," Minn. Stat. § 609.322, subd. 1a(1)-(2), "solicit[ing] or procur[ing] patrons for a prostitute," "provid[ing] . . . premises or facilities . . . to aid the prostitution of an individual," and "transport[ing] an individual . . . to aid the prostitution of the

11

individual," *id.*, § 609.321, subd. 7. To the extent the statute regulates speech at all, speech in soliciting women to be prostitutes and promoting the prostitution of them has no lawful purpose, but rather is aimed at furthering the commission of a crime. *See Giboney*, 336 U.S. at 502 (identifying speech as unprotected where there was no lawful purpose for the speech).

Washington-Davis does not dispute that the statute at issue here regulates speech that is integral to criminal conduct. His overbreadth argument instead turns on whether Minn. Stat. § 609.322, subd. 1a(1)-(2), *also* criminalizes the solicitation and promotion of consenting adult actors to engage in sexual contact or sexual penetration for the production of sexually explicit films and photographs.[9] This type of speech is protected under the First Amendment. *See State v. Mauer*, 741 N.W.2d 107, 110 (Minn. 2007) (recognizing that non-obscene pornography with adult performers is protected speech under the First Amendment).

The promotion and solicitation statute, however, criminalizes the solicitation and promotion of individuals to engage in sexual conduct *only if* the sexual conduct is done "for the purpose of satisfying the actor's sexual impulses." Minn. Stat. § 609.321, subd. 10. The hiring of adults to perform or pose in a sexually explicit film or photograph is done for the purpose of making a film or photograph. Thus, the speech of those involved in a commercial adult-film production will not usually violate the statute.

---

[9] The statute does not apply to patrons or prostitutes who themselves engage in sex acts for hire. *See* Minn. Stat. §§ 609.321, subds. 4, 8; 609.322, subd. 1a. Those individuals are subject to criminal penalties under a separate statute. *See* Minn. Stat. § 609.324.

Their speech will fall under the statute only if the State can meet its high burden to show the purpose in hiring the actors to engage in sexual acts was to sexually gratify the performers. *Cf. State v. Theriault*, 960 A.2d 687, 692 (N.H. 2008) (concluding that a prostitution statute was overbroad as applied when the State did not have to prove that the defendant solicited a couple to have videotaped sexual intercourse "for the purpose of sexual arousal or gratification").

B.

But even assuming that the statute does, as Washington-Davis argues, restrict *some* amount of protected speech, that restriction does not automatically render the statute unconstitutionally overbroad. Rather, such a restriction dictates that we reach the second step in an overbreadth analysis, which requires that we determine whether the restriction is substantially overbroad "in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. A statute is substantially overbroad in violation of the First Amendment if, in addition to prohibiting unprotected speech, it also prohibits a substantial amount of constitutionally protected speech. *State v. Machholz*, 574 N.W.2d 415, 419 (Minn. 1998). And, in cases such as this, "where conduct and not merely speech is involved," the overbreadth of a statute must not only be substantial, but "real" as well. *Broadrick*, 413 U.S. at 615. That standard is not met here.

The legitimate sweep of Minn. Stat. § 609.322, subd. 1a(1)-(2), is the prevention of prostitution. To achieve that objective, the statute does not target broad categories of speech. And the statute does not prohibit general discussions regarding prostitution or pornography. *See Williams*, 553 U.S. at 299-300 ("[T]he term 'promotes' does not refer

13

to abstract advocacy, such as the statement 'I believe that [*X*] should be legal' or even 'I encourage you to [do *X*].' ").

Rather, the statute regulates speech and conduct aimed at specific individuals. In order to violate the statute, a person must "solicit[] or induce[] *an individual* to practice prostitution" or "promote[] the prostitution of *an individual*." Minn. Stat. § 609.322, subd. 1a(1)-(2) (emphasis added). The definition of the term "promotion" similarly limits the statute's application because "promotion" includes transporting "an individual" with the intent to aid the prostitution of the individual, owning, operating, or overseeing a place of prostitution, and operating a business of prostitution. Minn. Stat. § 609.321, subd. 7. The statute's regulation, therefore, is closely tied to the legitimate goal of combating prostitution.

Moreover, there is no evidence in this record that protected speech is, in fact, being chilled, or is likely to be chilled, as a result of the promotion and solicitation statute. Washington-Davis's argument that the statute is overbroad because it potentially prevents a film producer from soliciting performers for pornographic films is purely speculative. *See Williams*, 553 U.S. at 303 ("The 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.' " (quoting *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984))); *see also State v. Theriault*, 949 A.2d 678, 680-81 (N.H. 2008) (holding that a promotion-of-prostitution statute was "not substantially overbroad, because the possibility that it might be applied in some unconstitutional

14

manner is exceedingly slight"). We decline to strike down the statute because the overbreadth, if any, is not real and substantial.

As the Supreme Court noted in *Broadrick*, the statute need not "be discarded *in toto* because some persons' arguably protected conduct may or may not be caught or chilled by the statute." 413 U.S. at 618. Rather than striking down the statute as unconstitutionally overbroad, the statute's application to those involved in the making of pornography should be resolved, if it ever arises, through an as-applied challenge. *See generally id.* at 615-16 (noting that facial invalidation requires that the overbreadth of a statute be *real* and substantial, and that "whatever overbreadth may exist should be cured through case-by-case analysis of the [facts]"); *Theriault*, 949 A.2d at 681 (concluding that "any applications of the statute that infringe upon protected conduct, to the extent that such applications exist, may be remedied on a case-by-case basis").

In urging us to reach the opposite conclusion, Washington-Davis cites *Guinther v. Wilkinson*, 679 F. Supp. 1066, 1069-70 (D. Utah 1988). But the statute at issue in *Guinther* was much different. The statute at issue there defined prohibited "sexual activity" as including the touching of one's clothed body in an act of, or in an *apparent* act of, sexual stimulation, whether alone or between members of the same or opposite sex. *Id.* (quoting Utah Code Ann. § 76-10-1301(1) (Supp. 1987)). When challenged by performing artists, dancers, and actors, the court held that the statute was unconstitutional because it could regulate activity "which was so broad that it conceivably included conduct which could not justifiably be regulated." 679 F. Supp. at 1070. Because the

15

Utah statute defined "sexual activity" much more broadly than the statute at issue here, and lacked any "purpose" requirement, *Guinther* is inapposite.

In sum, invalidation of a statute for substantial overbreadth is "strong medicine" that should be used "only as a last resort." *Broadrick*, 413 U.S. at 613, 615; *see also Williams*, 553 U.S. at 292 (stating that "we have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep"). The record before us convinces us that such a prescription is not warranted here. We therefore hold that Minn. Stat. § 609.322, subd. 1a(1)-(2), is not unconstitutionally overbroad.[10]

## II.

We turn next to Washington-Davis's argument that he is entitled to a new trial on the counts involving B.R., S.A., C.B., and T.B. because the district court failed to properly instruct the jury on accomplice liability.[11] Because Washington-Davis did not

---

[10] Other courts have upheld similar solicitation-of-prostitution statutes against facial overbreadth challenges. *See D.C. v. Garcia*, 335 A.2d 217, 223-34 (D.C. 1975) (upholding the constitutionality of a statute prohibiting the solicitation of a law violation, which does not imply an ideological motivation but rather one of personal benefit or gain); *State v. Pegouskie*, 113 P.3d 811, 820 (Haw. Ct. App. 2005) (upholding the constitutionality of a statute against an overbreadth challenge because the statute did not proscribe constitutionally protected conduct); *Ford v. State*, 262 P.3d 1123, 1130-31 (Nev. 2011) (finding a statute that criminalizes the pandering of prostitution was not unconstitutionally overbroad because the statute required that the defendant target another individual with the specific intent of persuading them to commit prostitution and did not prohibit the abstract advocacy of prostitution);

[11] Washington-Davis does not argue that the aiding-and-abetting instructions were prejudicial with respect to J.M. because there is evidence indicating that Washington-Davis directly promoted the prostitution of J.M., in violation of Minn. Stat. § 609.322,

(Footnote continued on next page.)

object to the aiding-and-abetting jury instructions at trial, we review the instructions for plain error. *See State v. Milton*, 821 N.W.2d 789, 805 (Minn. 2012). Under the plain-error test, we determine whether the jury instructions (1) contained an error, (2) that was plain, and (3) that affected the defendant's substantial rights. *Id.* If the defendant establishes these three prongs, "we may correct the error only if it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn. 2001) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)); *accord State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998).

An individual is criminally liable for a crime committed by another "if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn. Stat. § 609.05, subd. 1 (2014). Accomplice-liability instructions "must explain to the jury that in order to find a defendant guilty as an accomplice, the jury must find beyond a reasonable doubt that the defendant knew his alleged accomplice was going to commit a crime and the defendant intended his presence or actions to further the commission of that crime." *Milton*, 821 N.W.2d at 808.

Here, the district court provided the following instruction on accomplice liability:

> The defendant is guilty of a crime committed by another person when the defendant has played an *intentional role* in aiding the commission of the crime and made no reasonable effort to prevent the crime before it was

_____

(Footnote continued from previous page.)
subd. 1a(2). The State argues that, for the same reason, the instructions were not prejudicial as to B.R. and S.A. We need not address the State's argument as to B.R. and S.A. because, as we conclude below, the erroneous jury instructions did not prejudice Washington-Davis.

17

committed. "Intentional role" includes aiding, advising, hiring, counseling, conspiring with, or procuring another to commit the crime.

(Emphasis added). The specific jury instructions for promotion of prostitution and solicitation of prostitution then required the jury to find that "the defendant, aiding and abetting or being aided and abetted by another, *intentionally* promoted the prostitution of [the victim]" or "*intentionally* solicited or induced [the victim] to practice prostitution." (Emphasis added). The jury was further instructed that the word "intentionally" meant that "the actor either has a purpose to do the thing or cause the result specified, or believes that the act performed by the actor, if successful, will cause the result."

The State concedes that the district court committed plain error by failing to explain "intentionally aiding," as required by *Milton*, 821 N.W.2d at 808. We therefore turn to whether this plain error affected Washington-Davis's substantial rights. To satisfy the third prong of the plain-error test, Washington-Davis bears the "heavy burden" of showing there is a "reasonable likelihood that giving the instruction in question had a significant effect on the jury verdict." *State v. Kelley*, 855 N.W.2d 269, 283 (Minn. 2014).

The instruction in this case is similar to that in *State v. Bahtuoh*, 840 N.W.2d 804 (Minn. 2013). In *Bahtuoh*, the defendant was convicted of first-degree felony murder while committing a drive-by shooting for the benefit of a gang. *Id*. at 807. The district court gave the jury an incorrect accomplice-liability instruction, stating that "a person's presence can constitute aiding and abetting if it is done intentionally and if it also aids or encourages the commission of the crime." *Id*. at 812. The instruction in *Bahtuoh* was

18

erroneous because it did not state that the defendant had to play a "knowing role" in the commission of the crime. *Id.* at 813. We concluded, however, that this error was "counterbalanced" by other instructions that "imposed a more stringent state-of-mind requirement than Minnesota law requires." *Id.* Particularly, the crime-specific jury instructions required that the jury find "the defendant, acting alone or intentionally aiding and abetting another, acted with the *intent to kill* [the victim.]" *Id.* at 814 (emphasis added). We held that any error in the jury instructions did not result in reversible error because "the jury instructions, considered as a whole, ensured that the jury was required to find, at a minimum, that Bahtuoh knew that [his co-defendant] planned to commit a crime and intended his actions to further it." *Id.* at 814-15.

The jury-instruction error here, like the one in *Bahtuoh*, does not require a new trial. The district court gave an erroneous jury instruction that failed to adequately explain what "intentionally aiding" means. *See Kelley*, 855 N.W.2d at 277-78 (identifying the failure to adequately explain the intentionality requirement of accomplice liability as a plain error). The court, however, went on to instruct the jury that, in order to find Washington-Davis guilty of aiding and abetting the solicitation or promotion of prostitution, the State had to prove beyond a reasonable doubt that Washington-Davis *himself* acted with the specific purpose of either soliciting a specific victim to practice prostitution or promoting the prostitution of a specific victim. As in *Bahtuoh*, the jury in the present case "was required to find that [Washington-Davis] had a *more* culpable state

19

of mind than is required for accomplice liability under Minnesota law." 840 N.W.2d at 814.[12]

By instructing the jury that, in order to be liable for a crime committed by another, the State had to prove that Washington-Davis "played an intentional role in aiding the commission of the crime and made no reasonable effort to prevent the crime before it was committed," the jury necessarily found that Washington-Davis knew the other person was going to commit a crime, which is one of the mental-state requirements for accomplice liability that must be explained to the jury. *See Milton*, 821 N.W.2d at 808. Because "[t]his case involves the unusual situation" in which any errors in the jury instructions "benefited the criminal defendant," the errors "favored [Washington-Davis] and therefore did not affect his substantial rights." *Bahtuoh*, 840 N.W.2d at 815 n.1. We therefore hold that the plainly erroneous jury instructions did not affect Washington-Davis's substantial rights.[13]

---

[12]     Washington-Davis also argues that the instruction requiring the jury to find that he "made no reasonable effort to prevent the crime" committed by another person improperly shifted the burden of proof to him and was therefore prejudicial. This argument is flawed because this aspect of the instructions actually required the *State* to prove an additional element that is not part of the offense charged. Washington-Davis was not required to show that he attempted to prevent the crime. Rather, the State had to prove, beyond a reasonable doubt, under the instructions given, that Washington-Davis did not make an attempt to prevent a crime committed by another person.

[13]     Washington-Davis contends that we should apply the factors identified in *State v. Watkins* to determine if the plain error in the jury instructions affected his substantial rights. *See* 840 N.W.2d 21, 28-29 (Minn. 2013) (stating that in determining whether the omission of an element of a charged offense was prejudicial, an appellate court "may consider, among other factors, whether: (1) the defendant contested the omitted element and submitted evidence to support a contrary finding, (2) the State submitted

(Footnote continued on next page.)

Finally, we consider whether the evidence presented at trial was sufficient to prove that Washington-Davis intentionally aided and abetted his brother Otis's solicitation of C.B. and T.B. to become prostitutes. An individual is guilty of a crime if he or she intentionally solicits or induces a person to practice prostitution. Minn. Stat. § 609.322, subds. 1(a)(1), 1a(1). The parties agree that we should apply the two-step test for reviewing the sufficiency of circumstantial evidence to determine the merits of Washington-Davis's claim. *See State v. McAllister*, 862 N.W.2d 49, 53 (Minn. 2015) (stressing that it is rare for the State to prove state of mind through direct evidence). Under the circumstantial-evidence test, we first identify the circumstances proved, deferring to the fact-finder's "acceptance of the proof of the[] circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.*

---

(Footnote continued from previous page.)
overwhelming evidence to prove that element, and (3) the jury's verdict nonetheless encompassed a finding on that element"). But the *Watkins* factors do not apply in every jury-instruction-error case that examines the substantial-rights prong of the plain-error test. *See State v. Peltier*, 874 N.W.2d 792, 801 (Minn. 2016) (noting that *Watkins* did not adopt an "exclusive" test for assessing the substantial-rights prong). The overall goal in every substantial-rights analysis in a jury-instruction-error case is to determine whether there is "a reasonable likelihood that giving the instruction in question had a significant effect on the jury's verdict." *State v. Gomez*, 721 N.W.2d 871, 880 (Minn. 2006) (examining the prejudice prong in the context of an erroneously included jury instruction); *see also Watkins*, 840 N.W.2d at 28 (quoting *Gomez* in the context of a jury instruction that omitted an element). We answer that question by considering different factors depending on the type of error and the particular facts of each case. Although the individual factors we examine in each case can vary, the overarching question in all types of jury-instruction-error cases is the same. In this case, because the analysis we followed in *Bahtouh* resolves the substantial-rights inquiry, we need not also address the *Watkins* factors.

at 53-54. After identifying the circumstances proved, we "independently examine the reasonableness of all inferences that might be drawn from the circumstances proved" to determine "whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id*. at 54.

The circumstances proved establish that Washington-Davis and his brother were actively involved in a family-run prostitution scheme that spanned nearly 5 years, the center of which was Washington-Davis's uncle's house. Specifically with respect to the two women at issue, the circumstances proved that Washington-Davis and Otis worked together to solicit C.B. and T.B. to commit sexual acts for money. The brothers jointly picked up C.B. and T.B., brought them to the headquarters of the family prostitution operation, and discussed how much money they could make from prostituting the two women. The brothers then discussed with whom (Washington-Davis or Otis) C.B. and T.B. should go so that they could observe what the prostitutes did. The brothers also offered to take photos of C.B. and T.B. and post advertisements for them. Otis continued to solicit C.B. and T.B. after Washington-Davis left the house with two prostitutes.

The circumstances proved are inconsistent with any rational hypothesis other than guilt. In addition to Washington-Davis's actions on July 6, 2012, his history of involvement in his family's long-running prostitution scheme "leads so directly to [] guilt . . . as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *See State v. Hanson*, 800 N.W.2d 618, 622 (Minn. 2011). Washington-Davis was in charge of posting ads and taking pictures of the women for use in the ads. He drove numerous women to out-call locations, where the women would engage in acts of

22

prostitution, or he rode along to provide protection for the women. He directly solicited a number of women to practice prostitution and promoted the prostitution of a number of women. Washington-Davis's extensive involvement in the ongoing criminal scheme, along with his conduct on July 6, 2012, makes it unreasonable to infer that Washington-Davis was a passive bystander in his brother's attempt to solicit C.B. and T.B. to practice prostitution. *See State v. Yang*, 774 N.W.2d 539, 562 (Minn. 2009) ("Presence, companionship, and conduct before and after an offense are circumstances from which a person's criminal intent may be inferred." (quoting *State v. Russell*, 503 N.W.2d 110, 114 (Minn. 1993))).

In urging us to conclude that the circumstances proved support an alternative hypothesis that he was "passively present" while his brother attempted to persuade the women to work as prostitutes, Washington-Davis cites *State v. Ulvinen*, 313 N.W.2d 425 (Minn. 1981). In that case, we concluded that the evidence was insufficient to support a conviction of first-degree murder on an accomplice-liability theory when the defendant merely commented that the murder was "for the best" and the evidence did not show the defendant took any active steps to "aid, advise, or counsel" the principal in the commission of the crime. *Id*. at 427, 429. *Ulvinen* is inapposite.

Washington-Davis was not a passive observer, but rather an active participant. Washington-Davis actively engaged C.B. and T.B. in an effort to solicit them to practice prostitution: *they* (Washington-Davis and Otis) wanted C.B. and T.B. "to take pictures," *they* discussed how much money *they* could make, and *they* decided C.B. would stay with Otis rather than accompany Washington-Davis and two other prostitutes. Washington-

23

Davis's testimony that he and his brother brought the women to the house merely to smoke marijuana and play pool was rejected by the jury, is inconsistent with the verdict, and therefore is of no consequence on our review of the sufficiency of the evidence. *See McAllister*, 862 N.W.2d at 53-54 (rejecting evidence in the record that conflicts with the circumstances proved by the State).

Washington-Davis's active involvement with Otis on July 6, 2012, as well as his past conduct in his family's prostitution business, points unerringly to guilt. Washington-Davis knew Otis was soliciting C.B. and T.B. to engage in prostitution and intended his presence and actions to further that goal. Washington-Davis's hypothesis that he was "passively present" for the solicitation of C.B. and T.B. is unreasonable in light of all the circumstances proved. We therefore hold that there is sufficient evidence to prove beyond a reasonable doubt that Washington-Davis intentionally aided in the solicitation of C.B. and T.B. to practice prostitution.

Affirmed.


CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

24