*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1916**

State of Minnesota,
Respondent,

vs.

Deeforest Mentay Houston,
Appellant.

**Filed November 14, 2016
Affirmed
Jesson, Judge**

Hennepin County District Court
File No. 27-CR-14-15971

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Jesson, Presiding Judge; Stauber, Judge; and Reyes, Judge.

UNPUBLISHED OPINION

**JESSON**, Judge

Appellant Deeforest Houston challenges his conviction of sex trafficking, arguing that the evidence was insufficient to support his conviction and that the district court abused its discretion by denying his motion for a mistrial. We affirm.

## FACTS

On June 3, 2014, Houston responded to an advertisement placed on Backpage.com by undercover police officer Susan Hartnett, who was working in a joint prostitution detail of the Bloomington and St. Paul police departments. The advertisement was placed in the "escorts" section of Backpage.com under the "adult entertainment" category. The advertisement was titled "Because 2 is BeTTer than 1!!! Specials!!" and described:

> Are you up for the experience of a lifetime?
> We're sexy, discreet, and ready to play!
> Why not spoil yourself with a much needed treat.
> We are highly addictive so be careful :)
> 100% Real Pics!!! 100% independent!!!
> No bait & switch
> No need to be shy =)
> we're very down to earth
> Ask about our specials!!
> . . . Taylor and Sadie xoxo

It contained four photographs of two women in revealing underwear, showing only their bodies below the head. The telephone number in the advertisement was the undercover officer's telephone number.

Houston communicated with Hartnett primarily through text messages and telephone calls over the next day. He asked their ages and sent photos of himself. He

2

inquired if the women worked alone or if they had a "daddy," and explained that the two women needed a "good daddy." In a telephone call, Houston said he was "looking for some sexy ladies, or one lady that might want to go to bed with me." He stated that he wanted to "take care of business" and make business. He asked, "you want me to come and check you out and play with you, huh?" He told Hartnett that he was an "adult entertainer" who designed "web page ads" and made "fake identities." He asked if they needed a "partner in crime" and proposed that he could get them one thousand dollars per day and split it with them. He also asked if the women had cars. When Houston was asked if he was going to "just get business for us or are you gonna [sic] like, look out for us," he responded that he could place advertisements and drive the women. After learning that Hartnett placed ads and worked out of a hotel, he asked: "you guys ain't [sic] no police or anything like that, are you?"

On June 4, Houston and Hartnett arranged to meet at a hotel. On his way to see Hartnett, Houston called and asked "how many girls you got there with you?" and if their day was "productive or what?" He was told to meet them in their hotel room. Hartnett said she was doing business and trying to make money—she did not want to meet in the lobby and draw attention to herself. Houston responded "Yeah, like the police, right?" Houston verified the hotel room number once he arrived. He knocked on the door and was then arrested in the hallway by Sergeant Jeffrey Giles.

Houston was charged with engaging in the sex trafficking of an individual. *See* Minn. Stat. § 609.322, subd. 1a(4) (2012). He was found guilty after a jury trial. He

was sentenced to 50 months in prison, a downward durational departure from a presumptive sentence of 117 months. This appeal follows.

## D E C I S I O N

### I. There was sufficient evidence to prove Houston recruited or enticed Hartnett to engage in prostitution.

Houston challenges his conviction, arguing that it was based on circumstantial evidence and that the state did not disprove the hypothesis that he was looking for someone to work with in the adult-entertainment industry. Because there is sufficient evidence to prove beyond a reasonable doubt that Houston recruited or enticed Hartnett to engage in prostitution under the circumstantial-evidence standard, we affirm.

To prove Houston guilty of engaging in sex trafficking, the state was required to prove that he recruited or enticed a person to practice prostitution. *See* Minn. Stat. § 609.322, subd. 1a(4); Minn. Stat § 609.321, subd. 7a(1) (2012). The parties disagree on the applicable standard for reviewing the sufficiency of the evidence when the state presents both direct and circumstantial evidence to obtain a conviction.[1] We do not need to resolve the parties' dispute about which evidentiary standard applies here because the

---

[1] Houston would have us apply the two-step analysis for circumstantial evidence to evaluate the sufficiency of the evidence. In contrast, the state encourages us to apply the traditional standard, arguing that it proved each element of the offense by direct evidence. We note that where a disputed element was proven by both direct and circumstantial evidence, we apply the circumstantial-evidence standard to review the sufficiency of the evidence. *See State v. Porte*, 832 N.W.2d 303, 309-10 (Minn. App. 2013) (applying circumstantial-evidence test when direct evidence by itself is insufficient to prove disputed element).

4

evidence is sufficient to support his conviction even under the stricter circumstantial-evidence standard.

Under the circumstantial-evidence standard, we first identify the circumstances proved, deferring to the jury's acceptance of the state's evidence and rejection of conflicting evidence. *State v. Washington-Davis*, 881 N.W.2d 531, 543 (Minn. 2016). Second, we examine the reasonableness of the inferences that can be drawn from the facts proved "to determine whether the circumstances are consistent with guilt and inconsistent with any rational hypothesis except that of guilt". *Id.* (citation and quotation omitted).

Here, the evidence and the testimony of the state establish the following: (1) Hartnett placed an advertisement in the "escorts" section of Backpage.com; (2) she routinely posted advertisements in the "escorts" section of Backpage.com because that was where the "supply and demand" for prostitution were posted; (3) the advertisement suggested an erotic experience and included four photographs of two women in undergarments, but did not include an explicit offer of sexual contact; (4) Houston responded to the advertisement with text messages and telephone calls; (5) he asked the women's ages, whether they "work[ed] alone," whether they had a "daddy," and whether they needed a "partner in crime"; (6) he said he was looking for "some sexy ladies, or one lady that might want to go to bed with me"; (7) he added that he was looking to "take care of business" and make business; (8) he described himself as an "adult entertainer" who designed "web page ads" and made "fake identities" and offered to help place advertisements and drive them; (9) he told the women he could get them $1,000 per day and split it; (10) Houston agreed to meet the women at a hotel; (11) Hartnett told him that

they were doing business and she had two women with her; (12) Hartnett told Houston that she wanted to avoid drawing attention to herself and he replied, "yeah, like the police"; (13) Hartnett testified that, in her then two years of experience in prostitution/human trafficking and ten years as a police officer, a "pimp" is also known as a "daddy" and often rents hotels, posts advertisements, provides transportation, offers protection, and purchases gifts for prostitutes; and (14) Houston asked if Hartnett was a police officer.

Next, we address whether the circumstances are reasonably consistent with Houston's hypothesis that he was recruiting Hartnett as a lawful adult escort to work with him in the adult entertainment business. The circumstances are not. On the contrary, the facts proved here point only toward guilt for three reasons: (1) the sexual context and nature of the advertisements, (2) the overt offers to recruit Hartnett to engage in prostitution, and (3) Houston's desire to avoid police and find a "partner in crime."

First, the advertisement unquestionably suggests an erotic experience even if it did not include an explicit offer of sexual contact. It was posted in the escort section of Backpage.com, a website where sex trafficking is commonly facilitated. It had pictures of two women in revealing undergarments. Hartnett testified that, in her two years of experience in prostitution and human trafficking, and ten years as a police officer, online advertisements are regularly used in sex trafficking. Upon seeing the advertisement, any reasonable person would know that it was suggesting a sexual experience. A hypothesis arguing that the advertisement was an invitation to make offers of employment in legal adult entertainment is unreasonable and unsupported.

6

Second, the nature of Houston's communications with Hartnett is inconsistent with requests for a lawful escort. Houston asked if the women worked alone and if they needed a "daddy." He called himself an "adult entertainer," but suggested that they needed a "good daddy." He offered to be the women's "daddy," to post advertisements online, to drive them, and to split the "thousand dollar[s]" per day. He said that he was looking for "sexy ladies" and for someone to "go to bed with me." Houston was seeking to make money with Hartnett and "make business."

Houston contends that his reference to "daddy" was slang for "a boyfriend or husband who takes cares of and looks out for a woman" or "a term for an age disparity in sexual relationships in which the older partner takes care of the younger financially." This explanation may be rational taken alone and ignoring the circumstances; here, however, Houston's use of "daddy" points toward guilt when considering the nature of the communications and the sexually explicit advertisement he responded to.

A rational hypothesis negating guilt must be based on more than mere conjecture or speculation. *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010); *State v. Andersen*, 784 N.W.2d 320, 330 (Minn. 2010). Houston offered to post advertisements, drive the women, and split the money—all legal if considered by themselves—but the hypothesis that he was looking for a relationship, in light of all of the circumstances, does not rise beyond mere conjecture. Moreover, as Hartnett testified, these are the types of activities that "pimps" and "daddys" do for prostitutes. She also testified that the term "daddy" is interchangeable for "pimp" in the sex-trafficking industry. The reasonableness of the

7

inferences from the circumstances proved is not consistent with Houston's hypothesis that he was looking for a partner in the adult entertainment business.

Finally, Houston's desire to avoid the police is inconsistent with a legitimate purpose to recruit employees. He made false identities. He knew Hartnett did not want to draw attention to herself in the hotel, "like the police." He was looking for a "partner in crime." While it is true, as Houston argues, that there are many legal forms of adult entertainment and that he did not explicitly say he wanted Hartnett to perform sex acts for other people for money, he asked, "you guys ain't [sic] no police or anything like that, are you?"

In light of all the reasonable inferences that can be drawn from the circumstances proved, there is sufficient evidence that the jury reasonably concluded that Houston wanted Hartnett to perform sexual acts for other people for money. There is no rational hypothesis except that of guilt.

II.    **The district court did not abuse its discretion when it denied Houston's motion for a mistrial.**

Houston additionally challenges the district court's denial of his motion for a mistrial. He argues that the district court improperly failed to grant a mistrial based on a witness's reference to using a database to look up his phone number and another witness's remark that he was arrested outside the hotel room for the safety of the undercover officer. A mistrial should be granted only if there is a reasonable probability that the outcome of the trial would have been different had the incident resulting in the motion not occurred. *State v. Manthey*, 711 N.W.2d 498, 506 (Minn. 2006). We review the denial of a mistrial

8

motion for abuse of discretion. *State v. Jorgensen*, 660 N.W.2d 127, 133 (Minn. 2003). Because the statements made by Sergeant Giles and Detective Jensen were passing remarks and were not emphasized, and because there was substantial evidence of guilt, the district court did not abuse its discretion by denying a mistrial.

At trial, Sergeant Giles testified that he arrested Houston in the hallway outside of the hotel room "for the safety of the undercover [officer] based on information on who we suspected was coming to the room." Houston did not object to this statement. The following day, Detective Heather Jensen testified that she had access to multiple police databases and, before Houston arrived at the hotel, she "ran this phone number in one of our databases and it came up as belonging to Mr. Houston." Houston then made his motion for a mistrial.

After denying the motion, the district court also offered a curative instruction to the jury to disregard Detective Jensen's statement after concluding (1) that the case is going to come down to the text messages and telephone calls, not the statements; and (2) that most jurors now believe that the police, the NSA, and the military have access to all kinds of databases, which contain identifying information. Houston rejected the curative instruction. The district court also instructed the state to not bring up the testimony in its closing argument, and the state complied.

The state is required to caution its witnesses against giving prejudicial testimony. *Manthey*, 711 N.W.2d at 506. And a prosecutor must prepare "his witnesses in such a way that they will not blurt out anything that might be inadmissible and prejudicial." *State v. Carlson*, 264 N.W.2d 639, 641 (Minn. 1978). But the district court judge is in the best

9

position to determine whether an inappropriate outburst or comment creates sufficient prejudice to deny the defendant a fair trial. *Manthey*, 711 N.W.2d at 506. Here, the prosecutor said she was surprised by Detective Jensen's testimony, explaining that "the answer I had expected was that the phone number was learned via the booking process because that's literally what it says in her report and that's what we talked about when I prepped her."

It is true, as Houston contends, that evidence of other crimes or bad acts is not admissible to prove that a defendant acted in conformity with his character. Minn. R. Evid. 404(b); *State v. Spreigl*, 272 Minn. 488, 490, 139 N.W.2d 167, 169 (1965). But a new trial is not warranted when a reference to a defendant's prior record is of a passing nature because it is unlikely that the statement played a significant role in persuading the jury to convict, especially if the evidence of guilt is substantial. *State v. Clark*, 486 N.W.2d 166, 170 (Minn. App. 1992) (citing *State v. Haglund*, 267 N.W.2d 503, 506 (Minn. 1978)).

In this situation, there is no reason to believe the state intended to elicit some objectionable or prejudicial statement from Detective Jensen or Sergeant Giles or to divert the jury from the issues before it. Even the state was surprised by Detective Jensen's answer. Detective Jensen did not testify, or even suggest, that Houston had prior contacts with the police nor did she say that he had committed prior bad acts. She merely testified about her role in the prostitution detail and how she assisted Hartnett. Her statement was made in passing, not emphasized, not repeated, nor even used in closing arguments. Her remark did not rise to a level that the jurors would likely remember or recognize its significance.

10

Similarly, Sergeant Giles's statement, referring to the safety of the undercover officer, was of a passing nature and did not disclose details of prior contacts. The state did not ask any more questions about it. His statement was unspecific and generally described the circumstance of arrest. He did not insinuate or suggest that Houston had a violent criminal history, nor did he say that he believed Houston was dangerous, so the statement is unlikely to have played a role in persuading the jurors, even if they remembered it.

It is unlikely that the officers' statements, individually or collectively, played a significant role in persuading the jury to convict because they were not emphasized, not used in the state's closing argument, and were incidental to the overwhelming evidence of telephone calls and text messages. Giving deference to the district court judge, who is in the best position to determine the statements' prejudicial effect on the jury, we conclude that the district court did not abuse its discretion in denying Houston's motion for a mistrial.

**Affirmed.**